## JAMES STEPHENS, plaintiff in error, *v.* THE PEOPLE, defendants in error.

Form of a judgment record on a conviction for murder, including an indictment for murder by poisoning.

On a trial for murder, it is competent for the court, without the consent either of the People or the prisoner, to permit a separation of the jury during the progress of the trial.

It is not error for the court to refuse to issue an attachment against a witness, on the application of the prisoner's counsel, after such counsel has stated that they have no other witnesses, and arrangements have been made for summing up the cause on both sides, and assented to by the court.   The opening of the testimony in that stage of the case rests in the discretion of the court.

The objection that the judgment record does not show the prisoner to have been present in court during the whole of the trial, nor at the rendition of the verdict, is not available on error when it appears by the record that he was personally present at the impanneling of the jury and when the judgment was rendered, and when the return of the minutes of the court, made to a writ of *certiorari,* shows that the jurors were polled on giving their verdict, and that the prisoner was present on every day of the trial previous to the rendering of the verdict.

Exceptions to the exclusion of documentary evidence, though well taken, are not available where such documents were admitted in evidence at a subsequent stage of the trial.

Exceptions to the rejection of questions put to a witness, though well taken, are not available on error, where it appears that the counsel making the objection, while the witness was still in court, and before the opposite party had closed his case, withdrew his objections, and consented that all the questions which had been excluded might be put to the witness and answered by him.

A judgment will not be reversed on the ground of the admission on the trial of impertinent and immaterial evidence, if such evidence was harmless.

It is competent to ask a physician, on his cross-examination, to give his opinion whether certain symptoms, particularly specified, were those of arsenical poisoning, when the witness has previously given testimony in relation to the same subject matter, and where the symptoms inquired about are the same of which evidence had been previously given by another witness.

Where immaterial evidence has been taken without objection, it is too late afterwards to object to its effect, and it is not erroneous to refuse to strike it out.

Whether, after the defence has rested, the prosecution shall be permitted to call a witness in support of previous testimony, is a matter of discretion in the court, not reviewable on error.

Stephens *v.* The People.

An anonymous letter, proved to have been written by the prisoner and sent to S. C., reflecting upon the character of S. B., a young lady of whom S. C. was the suitor, was held admissible in evidence against the prisoner, on a question of motive, on a trial for murder of the prisoner's wife by poisoning, it being charged, and there being circumstances tending strongly to show, that the object of the prisoner in committing the alleged murder, was to enable him to marry S. B.

The expression, by the court, of an opinion upon the weight of evidence, in charging the jury, is not ground of error, when the court also told the jury they were the judges of all questions of fact, and that they were to determine them without reference to any opinion expressed by the court.

Symptoms of poisoning by arsenic, and of the appearances on *post-mortem* examination in cases of death by poison, as described by witnesses and proved by eminent physicians and chemists.

Circumstantial evidences of guilt on a trial for murder by poisoning with arsenic.

Charge to the jury of Mr. Justice Roosevelt, on the trial before the Court of Oyer and Terminer.

The following propositions, charged by the judge on the trial, were affirmed by the court:

1. The counsel for the prosecution having read to the medical witnesses certain symptoms from a paper marked by the judge, and inquired their opinion as to the cause of death in a case where such symptoms existed, if the jury believe that the symptoms of which Mrs. S. (the person alleged to have been poisoned), complained in her lifetime, are not in all respects the symptoms stated in the paper read to the physicians, that then the medical opinions are not admissible as competent evidence to be weighed by the jury, and cannot be taken into consideration.

2. If the jury are of opinion that the body of Mrs. S., after being exhumed for analysis, was so exposed that access could be had to it by other parties than those who made the *post-mortem* examination of the body and conducted the chemical analysis, under such circumstances that they could have applied arsenic to it, and particularly if they believe that R. B., one of the witnesses for the prosecution, who first charged the prisoner with poisoning his wife, actually had access to the body and tampered with it, so much of the analysis as was made after the body was so exposed and tampered with, is not competent evidence against the prisoner, and should be disregarded by the jury.

3. Where a prisoner is charged with the commission of a crime, and evidence of good character is introduced by him, which is not controverted on the part of the People, such evidence is to be considered by the jury, and is not merely of value in doubtful cases, but will of itself sometimes create a doubt when, without it, none could exist; and if good character be proved to the satifsaction of the jury, it should produce an acquittal, even in cases where the whole evidence slightly preponderated against the accused.

4. When a charge depends upon circumstantial evidence, it ought not only to be consistent with the prisoner's guilt, but inconsistent with any other rational conclusion.

5. If the jury, upon considering the whole of the evidence, have a reasonable doubt of the guilt of the defendant of the offence charged in the indictment, it is their duty to acquit.

6. If the jury believe that R. B. attempted to assassinate the prisoner before his arrest upon the charge of poisoning his wife, and that he entertained feelings of animosity and hatred towards him, and if the jury believe that S. and F. B. are also hostile towards the prisoner, and have quarrelled with him, that then they should consider these matters in weighing the degree of credit which is to be given to their testimony.

Form of a writ of *certiorari* to the Oyer and Terminer to bring up certain papers not constituting a part of the judgment record.

THIS case came before this court on a writ of error directed to the New York Oyer and Terminer; in return to which writ the clerk of such court returned the following record of conviction:

*uuu*

*City and County of New York, ss:*

Be it remembered, that at a Court of General Sessions of the Peace, holden at the City Hall, of the city of New York, in and for the city and county of New York, on the first Monday of December, in the year of our Lord one thousand eight hundred and fifty-eight, before George G. Barnard, Esquire, Recorder of the said city of New York, justice of the said court, assigned to keep the peace of the said city and county of New York, and to inquire by the oaths of good and lawful men of the said county, of all crimes and misdemeanors committed or triable in the said county, to hear, determine and punish according to law, all crimes and misdemeanors in the said city and county, done and committed.

By the oath of Benjamin F. Camp, foreman, Simeon Baldwin, Simon Bache, Joseph M. Cooper, Daniel M. Devoe, Alfred Decker, Charles W. Foster, Alexander Frazer, Joseph W. Haven, Henry W. Hunt, John C. Hines, George R. Lockwood, Joseph W. Meeks, Henry Marks, Hamilton R. Searles, James B. Taylor, Norman White, Aaron N. Cohen, John Denham, William H. Dodge, William McArthur, Thomas Trainer, Martin Waters, then and there duly charged and sworn to inquire for the People of the State of New York in and for

the body of the said city and county, it was then and there presented as follows, that is to say:

*City and County of New York, ss:*
The jurors of the People of the State of New York, in and
  for the body of the city and county of New York, on
  their oath present:
  That James Stephens, late of the first ward of the city of New York, in the county of New York aforesaid, not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, and of his malice aforethought, wickedly contriving and intending, one Sophia Stephens, with poison, willfully, feloniously, and of his malice aforethought, to kill and murder, on the twenty-second day of September, in the year of our Lord one thousand eight hundred and fifty-seven, and at the ward, city and county aforesaid, with force and arms, in and upon the said Sophia Stephens, then and there being, willfully, feloniously, and of his malice aforethought, did make an assault, and a certain quantity of a certain deadly poison, called and known as arsenic, to wit, three drachms of arsenic, willfully, feloniously, and of his malice aforethought, and well knowing, then and there, the said arsenic to be a deadly poison, did give and administer to her, the said Sophia Stephens, to take and swallow down into her body; and the said Sophia Stephens, afterwards, to wit, on the day and year aforesaid, at the ward, city and county aforesaid, the said deadly poison, to wit, the said three drachms of arsenic, so as aforesaid given and administered, by the persuasion and procurement of him, the said James Stephens, did take and swallow down into her body; and thereupon the said Sophia Stephens, by the poison so as aforesaid given and administered by the said James Stephens, and so taken and swallowed down into her body as aforesaid, became then and there mortally sick and distempered in her body; and the said Sophia Stephens, of the poison aforesaid, and of the mortal sickness and distemper occasioned thereby, as aforesaid, from the said twenty-second day of September, in the year aforesaid, until

the twenty-third day of September, in the same year afore-said, at the ward, city and county aforesaid, did languish, and languishing did live; on which said twenty-third day of September, in the year last aforesaid, she, the said Sophia Stephens, of the deadly poison aforesaid, and of the mortal sickness and distemper thereby occasioned, as aforesaid, did then and there die.

And so the jurors aforesaid, upon their oath aforesaid, do say: That the said James Stephens, her, the said Sophia Stephens, in manner and form aforesaid, and by the means aforesaid, on the day and year last aforesaid, at the ward, city and county aforesaid, then and there, willfully, feloniously and of his malice aforethought, did kill and murder, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York, and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present: That the said James Stephens, late of the ward, city and county aforesaid, on the twenty-second day of September, in the year of our Lord one thousand eight hundred and fifty-seven, at the ward, city and county aforesaid, contriving and intending, one Sophia Stephens, willfully, feloniously and of his malice aforethought, to kill and murder, with force and arms, in and upon the said Sophia Stephens, then and there being, willfully, feloniously and of his malice aforethought, did make an assault, and a large quantity, to wit, four ounces of laudanum, being a deadly poison, willfully, feloniously and of his malice aforethought, did give and administer unto her, the said Sophia Stephens, to take, drink and swallow down into her body, he, the said James Stephens, then and there well knowing the said laudanum to be a deadly poison, and the said Sophia Stephens, the said laudanum so given and administered unto her by the said James Stephens as aforesaid, did then and there take, drink and swallow down into her body, by means of which said taking and swallowing down, the said Sophia Stephens became and was mortally sick and distempered in her body, of which said poisoning and

mortal sickness and distemper, the said Sophia Stephens, from the said twenty-second day of September, in the year last aforesaid, until the twenty-third day of September, in the same year aforesaid, at the ward, city and county aforesaid, did languish, and languishing did live, on which said twenty-third day of September, in the year last aforesaid, the said Sophia Stephens, of the deadly poison aforesaid, and of the mortal sickness and distemper thereby occasioned as aforesaid, did then and there die.

And so the said jurors aforesaid, upon their oath aforesaid, do say: That the said James Stephens, her, the said Sophia Stephens, in manner and form aforesaid, on the day and year last aforesaid, at the ward, city and county aforesaid, then and there, willfully, feloniously and of his malice aforethought, did kill and murder, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York, and their dignity.

JOSEPH BLUNT, *District Attorney.*

And the said James Stephens, afterwards, to wit, on the twenty-third day of December, in the year of our Lord one thousand eight hundred and fifty-eight, at the place last before mentioned, before the said justice above named, came in his own proper person, and being brought to the bar here in his own proper person, and arraigned upon said indictment, and having heard the said indictment read, and being asked whether he demanded a trial upon the said indictment, answered that he does require a trial thereon, and says he is not guilty thereof; and thereupon for good and ill is put upon the country, and Joseph Blunt, Esquire, District Attorney, for the city and county of New York, who prosecutes for the People of the said State of New York, in their behalf doth the like. And on motion of Joseph Blunt, Esquire, District Attorney as aforesaid, ordered that the said indictment be sent to the next Court of Oyer and Terminer, to be held in and for the city and county of New York, to be there determined according to law. And afterwards, to wit, on the third day of January, in the

year one thousand eight hundred and fifty-nine, at a Court of Oyer and Terminer, held in and for the city and county of New York, at the City Hall of the said city, before the Honorable James J. Roosevelt, one of the Justices of the Supreme Court of the State of New York, and judge of the said court, being the next Court of Oyer and Terminer held in and for the city and county of New York, the said indictment was sent to and received by the said last mentioned court, to be determined according to law. And afterwards, to wit, on the seventh day of March, in the year last aforesaid, at the said Court of Oyer and Terminer held in and for the said city and county, before the Honorable James J. Roosevelt, one of the Justices of the Supreme Court of the State of New York, and Judge of the said Court of Oyer and Terminer, the process and proceedings aforesaid, before the court aforesaid, having been continued by due course of law, being as yet of the same January term of the said Court of Oyer and Terminer, held in and for the city and county aforesaid, on which said last mentioned day comes the said James Stephens, and Nelson J. Waterbury, Esquire, District Attorney for the city and county of New York, likewise comes; therefore let a jury thereupon immediately come before the court last above mentioned, of free and lawful men of the said city and county, each of whom hath, &c., by whom the truth of the matter may be better known and who are not of kin to the said James Stephens, to recognize upon their oath whether the said James Stephens be guilty of the murder and felony, in the indictment aforesaid above specified, or not guilty. And the jurors of the said jury, by John Kelly, Esquire, the sheriff of the city and county of New York, for this purpose impanneled and returned, to wit: Alfred Brush, Henry C. Hall, Marcus Hunter, Robert Lewis, Carrington M. Fuller, Augustus J. Gillett, Charles E. Hadden, Casper Trumpey, Abraham Gumpp, James M. Marsh, Lemuel Hayward, George Ackerman, who being called, come, and who being then and there elected, tried and sworn, well and truly to try, and true deliverance make between the People of the State of New York and the said James Stephens, then at the

Stephens *v.* The People.

bar, whom they should have in charge upon the said indictment, and a true verdict give according to evidence; and forasmuch as it appears to the court here that justice cannot be done if this court proceed without interruption upon the said trial, the same is continued by adjournment from day to day until the twenty-sixth day of March, in the year last aforesaid, upon which said twenty-sixth day of March, in the year aforesaid, the jurors of the said jury, upon their oath say, that the said James Stephens is guilty of the murder and felony above charged in the form aforesaid, as by the indictment aforesaid is above alleged against him. Whereupon a day is given to the said James Stephens to hear judgment upon the said verdict, to wit: on Thursday, the thirty-first day of March next, in the same January term, to which day the proceedings aforesaid are continued, at which day and place, before the court aforesaid, and before the justice aforesaid, come the said James Stephens, in his proper person, and Nelson J. Waterbury, Esquire, District Attorney aforesaid, who thereupon moves for judgment upon the said James Stephens, according to law. And upon this it is demanded of the said James Stephens, whether he hath or knoweth anything to say wherefore the said justice here ought not, upon the premises and verdict aforesaid, to proceed to judgment against him, who nothing further saith, unless as before he had said.

Whereupon all and singular the premises being seen, and by the same court here fully understood, it is considered, ordered and adjudged by the said court, that the said James Stephens, for the murder and felony aforesaid, whereof he stands convicted as aforesaid, be taken hence to the city prison of the city of New York, from whence he came, and on Friday, the twentieth day of May, then next ensuing, and then and there be hanged by the neck until he be dead.

NELSON J. WATERBURY,
*District Attorney.*

Judgment signed this twelfth day of May, in the year one thousand eight hundred and fifty-nine.

J. J. ROOSEVELT.

To this record of conviction was annexed ·the bill of exceptions, by which it appeared that, at the trial, evidence was given, a portion of which was as follows:

*Dr. Josiah Cadmus,* called for the People and sworn: I attended Mrs. Stephens during her last illness; I paid her two visits—one upon the 6th, the other upon the 7th of September, 1857; don't recollect what I prescribed; I think she was troubled with nausea, sickness of the stomach, or weakness; there was nothing in the occurrences of the 6th and 7th of September that left any distinct impression on my mind; I did not call again; the reason I did not, was because I attended the prisoner's family some six or seven years previously, and he disputed my bill, on the ground that he had not sent for me as many times as I had charged; so far as my own knowledge was concerned, I considered Mrs. Stephens healthy; I do not know personally anything to the contrary; she was a large-sized woman.

*Dr. Francis W. Iremonger,* called for the People and sworn: I attended Mrs. Stephens during her last sickness; I first saw her four or five days before her death; I found her in bed suffering from vomiting and pain in the stomach, increased by pressure, the usual symptoms of inflammation of the stomach; she was a great deal debilitated; she said very little to me, and I do not recollect any of her words; I did not hear her complain of thirst, but from the other symptoms she must have been thirsty; I did not suspect at the time that arsenic had been administered; she had inflammation of the stomach, I have no doubt; the effect of arsenic is to cause inflammation of the stomach; I recollect my first prescription; it is dated the 18th of September, 1857; my last visit was made about thirty-six or forty hours before Mrs. Stephens' death; I gave a certificate of the cause of her death; I stated it to be inflammation of the stomach.

The witness, among other things, further testifies as follows: I understood that Mrs. Stephens had been sick some two weeks when I first visited her; I so understood from the prisoner, I think; I do not recollect how long she had been con-

Stephens *v.* The People.

fined to her bed; I am sure that I visited her as many as three times; I prescribed for her upon my first visit; I recollect only one prescription afterward; the prescriptions were put up at Shipley & Vanderhoof's.

(Here a book purporting to be the prescription book of Shipley & Vanderhoof was shown to witness, and he testified as follows:)

I presume that the prescription in my handwriting, dated September 18th, 1857, was ordered by me for Mrs. Stephens; it is for some nitre and Dover's powders, and read as follows: "Nitre, ½ drachm, Dover's powders 12 grains, divided into six parts." I find another prescription in this book in my handwriting, dated September 19th, 1857, but I do not recollect whether or not I prescribed it for Mrs. Stephens; I have no recollection of it; it is as follows: "Quinine 20 grains, ox-gall a drachm, made into twenty pills." The next prescription in my handwriting I recollect distinctly; it is dated September 20th, 1857; it is for a Spanish fly blister; I distinctly recollect prescribing this for Mrs. Stephens; there is also an ointment of simple cerate and morphine; the blister is numbered 3824, and the ointment 3825; the next prescription given by me is numbered 3851; it is morphine and sugar, and was ordered by me on the 21st of September, but I have no recollection of ordering it for Mrs. Stephens; it reads: "1 grain morphine, and white sugar 10 grains, to be divided into four powders;" I ordered the blister to be applied to the pit of the stomach, to stop the pain, vomiting, &c.; her symptoms on my second visit were about the same as on the first; I stopped visiting Mrs. Stephens because I was told that I was not wanted; that there was no necessity for me to come again; I cannot say positively I was so told by the prisoner, but it is my impression that he told me; I have no recollection of at any time prescribing laudanum for Mrs. Stephens; I am as certain that I did not as I can be of anything; it is not my habit to do such a thing; I prescribed some lager beer to her at my last visit; I did not prescribe brandy for her at all; I gave a certificate that she died of inflammation of the stomach; I

last saw her thirty-six or forty hours before her death; Mrs. Stephens appeared to be a large, fleshy woman; during my visits I saw the prisoner; he was always present except at one visit, when he came in just as I was leaving.

The witness being cross-examined, among other things, testified as follows : I have never given sulphate of quinine mingled with arsenic; if a person had taken several doses of arsenic, there would most likely be serious burning in the throat, and also at the pit of the stomach; the eyes appear sunken from the swelling under the lids; I did not see the body after death; the prescriptions I testified about on my direct examination, did not contain any iron, nor any adulteration of arsenic, and if put up as ordered there was no arsenic in them; there is no adulteration of quinine by arsenic that I know of; Fanny Bell was present at my visits to Mrs. Stephens; I was examined as a witness before the coroner; so far as I know, I was asked if Mr. Stephens made use of any expressions about his wife other than that she was ill, and so far as I know I answered that he did not, that he was only anxious about her health; I said at the coroner's inquest that I had not then any suspicions that she was poisoned.

The *direct examination* of the witness being resumed, he testified, among other thing, as follows : I have never seen either Sophia or Fanny Bell at my office; Mrs. Stephens' sickness was not a case of cholera, nor of cholera morbus, nor of bilious colic; I never knew a person to be sick two weeks of bilious colic.

*Stephen H. Vanderhoof,* a witness, sworn and examined on the part of the prosecution, testified, among other things, as follows : I am an apothecary doing business at the corner of Twenty-seventh street and Third avenue, of the firm of Shipley & Vanderhoof. (The prescription book shown to Dr. Iremonger being also shown to this witness, he further testified as follows :) All the prescriptions we put up from written prescriptions for the month of September, 1857, were entered in this book; during the week previous to the 23d of September, the four following prescriptions, written by Dr. Iremon-

Stephens *v.* The People.

ger, were put up by me, to wit: The first on the 18th of September, numbered 3795, is nitre and Dover's powders; the next, on the 19th of September, numbered 3811, is quinine and ox gall; the next, on the 20th of September, are blister and ointment, and are numbered 3824 and 3825, and the next is on the 21st of September, numbered 3851, and is sulphate of morphine and sugar; these are all; I state positively that these four prescriptions were put up as written, and by myself; the articles put up in the prescriptions were pure, and did not contain any arsenic.

*Sophia Bell,* called and sworn for the People, testified, among other things, as follows: I reside at No. 69 Third avenue, and am twenty-five years of age; was born in the county of Cavan, Ireland; was the niece of Mrs. Stephens, the wife of the prisoner, and have resided in this country about seven years; I knew the prisoner in Ireland; saw him at my father's and grandfather's house in Ireland; I remember when the prisoner and my aunt were married; it was about ten or eleven years since; I remember their leaving Ireland to come to this country; it was about two or three years before I came; I came to this country with Mrs. and Miss Francis; after arriving here I went to board, and the prisoner came for me and took me to his house; after which I wrote to my father how kind the prisoner and his wife had been to me; and my father then wrote to me that I should be guided by them in every way; I remained in their family from three to five months, as near as I can remember; since I came to this country I have been a seamstress, and am at present a dressmaker; prior to my aunt's sickness I worked at my trade in this city; my aunt died at No. 166 East Twenty-seventh street; at the time of her death the prisoner's family consisted of himself, his wife and his daughter; and my sister and myself also lived with them; it was a three-story house, and the prisoner occupied the third floor, consisting of four rooms; Dr. Cadmus first attended my aunt during her last sickness; I saw him at the prisoner's house twice; his first call was in the forenoon; my aunt was out to market when he arrived; he called at the suggestion of the prisoner; my aunt

was complaining of an affection in the chest, a burning, and the prisoner said he would have to send for the doctor; she said "Never mind the doctor at present," as she thought he was not required; he insisted upon the doctor's coming; she went to market, and when the doctor came I told him where she was gone; I suppose the prisoner went after him, because he said he would send him around, and then left the house; my aunt told the doctor she thought something was the matter with her lungs, and wanted him to examine them; he said he could not conveniently then examine them, as he had no instruments with him, but that if she would come round to his office he would examine her chest; he came the next day and examined her chest and lungs; he did not prescribe for her that day; he said that if some person would come around, he would give her something; he thought there was nothing the matter with her chest; Mrs. Stephens was large and very stout; she weighed a hundred and sixty pounds two or three months before her death; before her last sickness, she did the work of her own family; before Dr. Cadmus made these calls, I had never seen a doctor there, except when Mrs. Stephens was confined at the birth of her child, about seven years ago; the child was born the day before I arrived, as I understood; when I arrived I saw Dr. Cadmus attending on my aunt; I think Dr. Iremonger attended my aunt the greater part of the last week previous to her death; between Dr. Cadmus attending her and Dr. Iremonger's calling, she was complaining; she would be a part of the day in bed and part of the day up; she appeared to grow worse while Dr. Iremonger was attending her; after Dr. Cadmus had stopped calling she still complained of the burning; she said it seemed like a ball of fire rolling; she would feel it in her stomach, and sometimes up in her throat, and she said she thought she could put her finger down her throat and feel it; I heard her complaining of the heat in her chest previous to Dr. Cadmus coming: but the burning still grew worse, and increased till she died; I did not hear her use the words "ball of fire," until after she was confined to her bed; about the time that Dr. Iremonger first visited her, I heard her

Stephens *v.* The People.

use this expression, "ball of fire," frequently, to almost every person who came in; she said frequently in my hearing that if she would neither eat nor drink she would be better; after eating and drinking she vomited severely, and there was a great deal of pain for her to vomit; she had to catch hold of the bed and strain herself very hard when vomiting; sometimes she vomited immediately after eating, and sometimes a long time would elapse before vomiting; she did not always vomit directly after eating; I do not know what she eat after her sickness, for I was there only a part of the time; I was working in Fifty-second street, between Fourth and Fifth avenues, at dressmaking; my sister, Fanny Bell, attended on her during her sickness; I remained at home two or three days, all day, with her, because she was much worse on the mornings of those days; it was while Dr. Iremonger was visiting her; I saw Mr. Stephens give her drinks—tea, lager beer, lemonade, buttermilk and coffee; I saw him give her no other kind of drinks; I saw him give her pills first, after Dr. Cadmus had called; he gave her laudanum two or three times in her drinks; my aunt was moaning, and Stephens said he would give her a little laudanum so that she might go to sleep and feel better when she awoke; he gave her this in lager beer or tea about a week before she died; on the afternoon preceding my aunt's death, when I returned from work, I went into the room to see my aunt; it was dark; my aunt was lying on the bed and breathing very hard; Stephens was in the room alone with my aunt; he was giving her something out of a tumbler, and told me to leave the room, which I did, and he shut the door; he told me my aunt was asleep; I was confused and frightened, for she was breathing so hard, and I returned to the room in a few minutes; Stephens was sitting in a chair by her bed; Mr. and Mrs. Pullman called; I went into the sitting room where they were, and I could hear my aunt breathing in that room; Mrs. Pullman told me not to let my aunt remain so long in that condition, as she would be exhausted, and I must wake her up; I remained in the sitting room until they left; it was raining very hard at the time; I

then run into my aunt's room, got her in my arms, pulled her up in the bed, and said I was determined to speak to her once more; I then shook her; when she woke she said to me, "Where have you been all day, that you have not been to see me?" she put her arms around me, and said she was going to die, and wished me to take care of her child; she said, where-ever I was, if I possibly could, I must see her child and take care of her; she committed her to my care; she asked to see my sister Fanny, and Fanny came in; she then folded her arms round Fanny, and said she hoped we would both meet her in heaven; that she was going to die, and felt happy; she asked my sister and me to sing for her, and we did; this was about nine o'clock, as near as I can remember; while we were singing, Mr. Armstrong, a class leader in Twenty-seventh street church, came in and prayed with my aunt; then the prisoner and his sister, Mrs. Susan Hannah, and her daughter, Maria Hannah, came in; previous to their coming in, I was obliged to ask Mr. Armstrong to leave the room, because my aunt was vomiting, and then her bowels began to change; my aunt died about three o'clock, Wednesday morning, 23d of September, 1857; I was not in the room when my aunt died; I was in the sitting room; Mr. Davis came in that evening; several times in the course of the evening my aunt vomited a good deal, and had discharges from her bowels; at different times said she felt quite numb, without hardly any feeling on one side; frequently, when discharges came from her bowels, she would ask me to raise her up; the only means I had to raise her was to get upon the bed and raise her up in that way; the last time she was raised, and as she was about to be laid back, she gave an awful shriek, which frightened me; Mr. Stephens and Mrs. Hannah wished to keep her still, so I left the room and went into the sitting room; the lamp was taken out of her room, and the room was kept dark until she died; Mrs. Hannah and my sister, Fanny Bell, I think, were in her room when she died; while Mrs. Hannah and I were laying her out, about a quart of black liquid altogether came from her mouth; she was lying upon her back upon the floor when the first came

Stephens *v.* The People.

out, and wnen she was turned over upon her side it came more freely from her mouth; between nine and ten o'clock she put her arms around the prisoner's neck and told him she was going to die, and wished him to meet her in heaven; when we were laying my aunt out, we removed a chest, standing on legs, about one foot long, for the purpose of having more room; I found a tumbler under this chest, and examined it; there was a very little liquid in it, and it smelled of laudanum; I had taken laudanum myself frequently before this time, and was acquainted with the smell of it; on Tuesday morning preceding my aunt's death, about seven or seven and a half o'clock, A. M., as I was going out to work, Mr. Stephens told me to stop at Dr. Iremonger's, and tell him not to come again till he was sent for; if he was wanted again, he, Mr. Stephens, would call for him; I told Mr. Stephens I would not do it; he then took his hat, left the room, and said he would go and tell him himself; when I went down stairs on my way to work, Mr. Stephens was standing on the stoop; he again asked me to stop on my way, and tell Dr. Iremonger not to come; I told him I would not—that I was going to ride; when I left the house he was standing on the stoop, and I took the Third avenue car; prior to my aunt's last sickness, Stephens refused to take her to any place, and spoke roughly to her; he did not treat her as a husband should treat a wife; he would frequently tell her to hush up, would speak roughly to her, and I heard him say he wished she was dead; this was two or three months before my aunt's death; he very commonly used such expressions as I have before stated to her; he commenced using this language some time previous to her death; I noticed it more particularly about ten or twelve months before her death; when I first came to this country, his conduct was very good towards her, in my estimation; my aunt's age at the time of her death was 46 years; Mr. Stephens' age was 32 years, as he said in my hearing, but I do not otherwise know his age; at the time of my aunt's death, I was receiving the addresses of Mr. Samuel Cardwell, real estate agent and dry goods merchant; his store is 496 Third avenue; the first I ever spoke to him was

at a Sabbath School pic-nic of the Twenty-seventh street Method-
ist Church, in the summer of 1857; he commenced visiting me
at my aunt's residence, in the summer before her death; he called
upon me there frequently; after my aunt's death, about a
month, Mr. Stephens said to me that he wished me to remain
at his house, and not go out to work any more, as I had been
out to work long enough; he also said that he would like to
get engaged to me, as there were other young ladies in the
Third avenue who would like him to pay attention to them,
and he did not wish to affront them; I have frequently seen
Mr. Stephens write, and am well acquainted with his hand-
writing; after my aunt's death, a day was fixed for my mar-
riage with Mr. Cardwell; I cannot tell the month; it was in
the summer of 1848; we were to be married in the Twenty-sev-
enth street Methodist Church; the time fixed was the day after
Mr. Cardwell received an anonymous letter; our intention to be
married at that time was known to a great many; we were not
married at the time fixed, because of the anonymous letter;
Mr. Stephens had written to Mr. Cardwell the day previous;
I have seen that letter. · (The letter is shown to the witness,
who testified further): This is the letter; this is in the prison-
er's handwriting; Mr. Cardwell and myself have not yet been
married; upon the receipt of this letter, Mr. Cardwell, my
brother, Robert Bell, and myself, went to Chester, in Orange
county, and remained a short time; I never saw Mrs. Stephens
vomit before her last sickness; she vomited a good deal; she
would vomit about half a basin full at a time; the vomited
matter was of different colors; sometimes it was yellowish,
at other times dark; I was present myself when she vomited
on some occasions; I remember her vomiting once when Dr.
Iremonger was there; Mr. Stephens was present many times
when she vomited; I did not particularly notice the smell of
the vomited matter; Mr. Stephens frequently emptied the
vomited matter from the basin into the slop pail; Mr. Stephens
several times carried the basin containing the vomited matter
to the window; he asked me once or twice to look at it; there
was something like little red spots in it, which he thought was

Stephens *v.* The People.

some of her liver; the way he examined the contents of the basin was to turn it up one side, then took a straw and drew what appeared to be little pieces of flesh up against the side of the basin; she complained of pain in her breast and burning once to Dr. Iremonger, when he ordered a blister; this was Sunday previous to her death; she complained of extreme thirst about two weeks before her death, and as I noticed, down to the time of her death; the morning before her death, as I left the house, she was complaining of thirst; I did not notice her unusual drowsiness until the night previous to her death; on the Sunday previous to her death, her eyes were very sharp looking; I mean by sharp looking, that when she looked at you she looked very sharp; after her confinement to her bed, her countenance looked a little excitable sometimes, and at other times she looked careworn and fatigued; I heard her complain of coldness of her feet about a week before she died; she said her feet and legs felt cold; she would frequently close her hands, and said they felt queer, and she could not tell what was the matter with them; the night before she died she said her whole side was numb; she said she did not have any power in her hands or arms; two or three days before her death she complained of cramps, but I cannot say particularly what she said; she said she thought it queer that her feet and legs were continually cold, and asked Fanny Bell to put a warm iron to her feet to keep her warm; she complained of cold perspiration on her hands, and always kept throwing her arms outside of the clothes; while she was confined to her bed she had suppression of the urine; before her sickness her lips were thin and had fallen in by reason of the loss of teeth, but on the Sunday preceding her death, I noticed that her lips were swollen, and asked Dr. Iremonger if he noticed it; he said not particularly; after he left the house she examined her face in a looking glass, and said I was right, that her lips were swollen; the discharge on the evening previous to her death produced an offensive smell; it looked very dark on Tuesday morning; it seemed to me as if it was mixed with blood; the evening before her death her eyes looked very sharp at every

person at whom she looked; she gave that horrible scream of which I have spoken, about 11 o'clock at night; I did not see her converse with any one after that, but she fell into a stupor, and so remained until she died; before she screamed she had a laughing expression of countenance, and talked to me about Mr. Cardwell, laughingly; the discharges from her bowels were accompanied with pain in her bowels; during her sickness she had a suppression of menstruation; William Knox is a cousin of mine; after Mrs. Stephens' death, a short time, William Knox came into the bedroom of myself and sister Fanny, and lay across the foot of the bed; at the first opportunity after that, I asked Mr. Stephens why he had sent William Knox into our room, and he said he could ruin our characters in the estimation of the public at large, if I and my sister left his house; William Knox did not get into our bed; he lay across the foot of it; when he first came into the room, I asked him where he was going, and he said Mr. Stephens had told him to come in there; when I accused Mr. Stephens of sending Knox there, he did not deny it; I could almost say that Mr. Stephens said that he told William Knox to go to our room; I told Mr. Stephens that William Knox had said that he had sent him there, and Mr. Stephens did not make any reply; when Stephens cast it up to me and my sister, that Knox had been lying on our bed, I told him that he had sent Knox there for his own purpose, and that William Knox told us that he had sent him to our room, and Mr. Stephens did not deny it; we remained at Mr. Stephens' house about six months after my aunt's death; when we left, we went to board with Mrs. Sherman, in Third avenue; when my brother, Robert Bell, arrived here, last July, I was at Mrs. Levy's in the Bowery, and my sister Fanny lived there with me; since Mr. Stephens' arrest, my sister and myself have boarded at 69 Third avenue; immediately after my aunt's death, my sister and myself talked of leaving; we wanted to get another place to live in; Mr. Stephens objected to myself and sister leaving, all the time and every way that he could, up to the time that we left; when Mr. Knox lay across the foot of our bed, he did

not undress himself; he did not get into the bed at all, but lay outside of the bed; I came home on the evening preceding my aunt's death, between seven and eight o'clock, and found Mr. Stephens in her room; he shortly after left her room, and remained in the sitting room a short time, and then went after Mrs. Hannah; he came back very soon with her; Mrs. Hannah's daughter came with them; while he was gone, I took a light into my aunt's room and saw something dark on the side of her mouth; I went to Greenwood cemetery when my aunt was buried; I saw her buried; I was present when her body was exhumed by the coroner; Mr. Cardwell and my sister were present; when the body was exhumed at Greenwood cemetery, the coffin was opened, and I recognized the body of my aunt; we accompanied the coroner to Bellevue Hospital, where he deposited the body in the dead house; and when the coffin was opened on the occasion of the *post-mortem* examination, I again identified it; before my aunt's death; and on the day of Mrs. John Stephenson's funeral, my aunt wanted to go to the funeral; Mr. Stephens refused to let her go; she insisted upon going; he struck her, and gave her a black eye; my aunt cried out that he was murdering her; the flesh became black afterward around the eye where he struck her; her eye continued discolored until she died; I never mixed any medicine that was administered to Mrs. Stephens; when Mr. Stephens proposed to marry me, about a month after my aunt's death, he said I could have him now as there was no barrier in the way; and when I spoke of leaving, he said that would be treating the child very different from what my aunt requested me to do; I asked him to let the child come with me, and he refused.

Being *cross-examined*, this witness, among other things, testified as follows: When I arrived in this country I stopped at Mr. Stephens' house three, four or five months; I do not recollect the precise time; I did not return there to board until the spring before my aunt's death; but I called at his house almost every Sunday, and two or three times a week; I was then a seamstress, and went out to work in the day and came home

at night, except a few nights when it stormed; when Dr. Cadmus first called on my aunt, she did not want a physician; she said she did not need a physician then; she complained of an affection in her chest; Dr. Cadmus did not prescribe for her at his first visit; Dr. Iremonger was called in at my aunt's request; Mr. Stephens was constantly there when Dr. Iremonger called; there was a signal put up for him in the hall window (a white cloth), to bring him home; he required my sister to put it there when my aunt wanted medicine, and when the doctor came; I never gave her any medicine; she said she would feel better if she would neither eat nor drink; I first noticed the diarrhea the morning before her death; there was one injection administered to her the Sunday before her death; I do not know that I swore yesterday that I never saw her take anything that had laudanum in it; I know that he put laudanum in a drink and gave it to me to carry to her; the evening before her death I went into my aunt's bedroom; about the time of my going in, Mrs. Pullman came in; after I came I had some conversation with her; when I went in Mr. Stephens sat on the chair, with his elbows on his knees, and his head on his hands, and said she was asleep, and he thought she would feel better when she awoke; she breathed hard, and had a very queer expression on her face; it was after dark; I could see from the light that stood in the sitting room; there was no light in the bedroom; Mrs. Pullman said, "Do not let her lie long in that position, she will be soon exhausted;" after Mr. and Mrs. Pullman left I awoke her; I told Mr. Stephens I was going to; he said he thought I had better not yet awhile; I said I was determined to speak to her once more before she died, and I would wake her up; when I talked to her she would go off to sleep, and I kept shaking her; I heard her say she hoped he (Mr. Stephens) would prepare to meet her in heaven; he did not like to have her go with him anywhere; he said everybody was laughing at him because she was so much older than he; he said they called her his mother; it was not agreeable to Mr. Stephens that Mr. Cardwell should visit me; he was decidedly opposed

to our marriage; after the anonymous letter was received, Mr. Cardwell did not say he would not marry me; it was at my own request that the marriage was postponed; I did not wish to get married under the feelings that I then had; Mr. Stephens threatened to ruin our characters if we left him; Mr. Stephens attempted to commit a rape on me in the Fifth avenue; he did not succeed; he also attempted to commit a rape upon me at his house on New Year's eve, when I was sick; he went out with me a great many times; my aunt sent him along with me; she said she thought Mr. Stephens was my best guardian, and she said he was the best person I could trust myself with, as I had no friend here; when he asked me to marry him, I told him he must never again breathe such a thing in my presence; when I saw Mrs. Stephens at the time of her exhumation, her face was discolored, yet I recognized it; I knew the clothes that I put around her neck before she was put into the coffin; if I had seen the body anywhere else I should have recognized it; my aunt's black eye was not occasioned by her falling against a chest, but she told me, that she hit it against the chest, to conceal Mr. Stephens' villainy; I saw him mix powders and give them to her; there were a good many circumstances to prevent our leaving Mr. Stephens' house sooner than we did; Mr. Stephens was in the habit of destroying all our letters, or doing as he pleased with them, and all the letters that I received from Mr. Cardwell came through him; if I wrote to Mr. Cardwell, he would snatch up the letter and ask me if I would like to have it; he threatened to show them to Mr. Brandon and Mr. Mills; I was afraid to leave his house, for he said he would ruin my character and my sister's in the estimation of the people; that he would say such things about us as would excommunicate us from the church, and that he would ruin us in the city; the Twenty-seventh street church was about a block from Mr. Stephens' house.

*Samuel Cardwell,* called upon the part of the People: I made an engagement to marry Miss Sophia Bell; it was made, I think, August 16th, 1858; the marriage was to have been performed in the Seventeenth-street church, but the minister had

gone into the country; I went to the minister of the Second-street church, and found the minister at home; we were to go at 2 o'clock next afternoon to his house; the night of the day I called upon the minister, I received an anonymous letter which prevented my marriage. (Letter previously shown to Sophia Bell shown to this witness.) This is the letter I received; about 9 o'clock in the evening before the day fixed for the marriage, I found this anonymous letter on my desk at home; it had been brought by a boy, and received by some person in my store; this is the letter I received; I have the envelop in which that letter was inclosed, and this is it. (Envelop produced.) The following indorsement is on said envelop: "Mr. Cardwell, between Thirty-fifth and Thirty-sixth street, Third avenue."

The counsel for prosecution here offered to read said letter in evidence, but first offered to the counsel for the prisoner the said letter as a subject of cross-examination by defence, and the witness for cross-examination upon it. The counsel for the prisoner objected to the reading of said letter in evidence, for the reason and on the ground that the prisoner had a right to cross-examine the witness upon the question of its reception by him, and the facts connected therewith, and that the prisoner cannot be compelled to commence his cross-examination even upon this point until the prosecution had finished their examination in chief, and the witness is turned over to the prisoner for general examination.

The counsel for the prosecution here again offered the prisoner's counsel an opportunity to cross-examine the witness before the introduction and reading of the letter, which offer was declined. The letter was then read as follows:

"My dear sir: I send to you one or to Lines to Let you know that I was informed that you are Keeping company with a young woman whose name is Bell. I want to Let you Know some of her good Behavier. I was Brought on a trial her on uncel concerning of her and him, and he Refused to tell anything until we Put the Booke in his hand, and then he would

not spake until there came witness against him, and he had to answer for himself. I went where she lived, in fifth avenue, and the lady told me about her which is not very good. I would not like to spak for some time Longer and you can ask her yourself and then you can judg for yourself, or ask her how she spent her nights when her ant was in the country, or when her ant and her sister was at the excursion, the man that went to the dore and herd them in the bed and she got up and Put a clought on the dore, this was all sworne before me and I now put you on your gard for you may here it yourself, you can go to that Lady and she will tell you she knows how she spent new years morning when I went into her uncel's and seen him and her in bed, she knows what she was doing and she was in church that night and went out and fainted and she sent in for her uncel and he went after them to his house. I know what I herd and seen, you can ask her and then you can judge for yourself it is a wonder she could have the face to Pass herself off on any man, she must think the are very Blind these are only a few things of what is against her, her good uncel and her will Be Brought where the will have to tell the truth and that very soon. Let you Be very wise and you can find it all out for as I Live I will make a example of him and her, for I never knew to grater villings than they were, and his wife alive, and I am told a very nice woman for the uncel was a raskel and she was not Better for she knew it was wrong. I will say no more now But I may soon meet you and I shall you some more about her Little none.

"don't be a foole for I am sure she could not Pass herself on you.

"Good by I am your friend when he was asked to clear her in the present of five he coud not do it for there was to many witness against him.

"You will soon hear more."

Before this letter was read, the witness had, among other things, testified as follows:

I commenced paying my addresses to Miss Sophia Bell in

the summer of 1857; I visited her very frequently up to and since the time of Mrs. Stephens' death; after my second visit, Mr. Stephens objected to my visiting her; he told me that it was impossible that I could ever get the girl, because her father would not permit it; that she was a member of the church, and I was not; that it was a hopeless case, and therefore I had better not have anything more to do about it; he once begged and bantered me about it three hours; he insulted me grossly; he called me a two-faced shuffling fellow, and things of that import; this was some few weeks after my first acquaintance with Miss Sophia Bell; on several subsequent occasions he waited for me when I was visiting Miss Bell; on one or two occasions on the outside of the house, until I came out; when I came out he commenced to talk to me, and abused me just in the same way, in reply to which I told him that he could not possibly prevent me from seeing the girl— that he might forbid me his house, and of course I would not come there; but if he wanted to prevent me from seeing her and paying her attentions, he must talk to her; a short time after the death of his wife, perhaps some three or four weeks, he forbid me his house. (After the introduction of the said letter marked "A," the witness, among other things, testified as follows): My matrimonial engagement still exists; during Mrs. Stephens' illness I was at her house some three or four times; I observed a peculiarity about her countenance; she always had, during her sickness, a piercing and anxious-like expression, as though she was suffering pain and was anxious; she had a very inquiring, anxious look about her; the first time I called on her during her sickness, I observed she had a black eye; this was about two weeks before she died; I saw it afterwards, when she lay dead: I was present at the exhumation of Mrs. Stephens' body in Greenwood Cemetery; the two Misses Bell, the coroner, Mr. Cushing, the undertaker, and myself were there, and other parties with whom I was not acquainted; I returned with the Misses Bell to Bellevue Hospital, and was there when the coffin was brought there; it was opened in Greenwood Cemetery, and I recognized the

body of Mrs. Stephens at once; it was again opened at Belle-vue Hospital, and I looked at her body and there recognized it; during Mrs. Stephens' sickness she compained of a burn-ing sensation at the pit of her stomach, like a ball of fire; she spoke to me about a physician, and I recommended Dr. Ire-monger to her; prior to her last sickness, the prisoner acted toward her in a very rough, boorish manner; his manner and language were decidedly unkind, as I thought; I was impressed with that idea.

*Fanny Bell,* called and sworn for the People, testified, among other things, as follows : I reside at 69 Third avenue; am be-tween nineteen and twenty years of age; Mrs. Stephens was my aunt, and Sophia Bell is my sister; I have been in this country a little over two years; on my arrival I stopped at the prisoner's house, and remained until after my aunt's death; she was taken sick about three weeks before her death; I do not remember of her being sick previously; she did all her own work, and the work of the family; before her sickness I worked at a millinery shop in Broadway; when she was taken sick I went home and attended her—attended her until she died; I was at home when Dr. Cadmus called; I know of his calling twice; the prisoner called him in; he said he would call the doctor in, and she said she did not require it; the first time the doctor called she was at market; he remained until she came in and for fifteen minutes longer; he prescribed no-thing then; he called again next day; the first day she said that nothing was the matter with her, unless something might be the matter with her lungs; she said she felt some affection iu her chest; the second time he examined her lungs, and said that nothing was the matter; that she would be well enough in a few days; I think Dr. Iremonger was called in about a week after that; during that week she was sometimes confined to her bed and sometimes able to sit up; she complained of burning in the chest and stomach; she complained more and grew worse towards the latter part of the week.

*Q.* During that one week, do you know whether your aunt partook of any fluid or not?

The counsel for the prisoner objected to the question, which objection was overruled, and exception taken by the counsel for the prisoner.

*A.* The prisoner gave her some apples and oranges.

The witness further testified, among other things, as follows: He peeled them for her once or twice; don't know how many; once he cut an orange in pieces and gave it to my aunt; after eating she vomited, as she did always after eating during her sickness; she never vomited before; after eating that orange, she vomited in about five minutes; Dr. Iremonger was called in about three days afterwards; the prisoner first pared the orange, then cut it up, put sugar on it, put it on a plate, and gave it to my aunt; between the visits of Drs. Cadmus and Iremonger, she complained of burning of her chest, stomach, and of vomiting; she said she felt as if she had a ball of fire in her chest and stomach, and if she could only take that out she would get well; one day at dinner we had some rice at dessert; I prepared the rice; the prisoner put some on a plate and took it to my aunt; she was in bed; he put white sugar on it; I saw him do so; she commenced eating it, and he remained a few minutes and then left the house; after I got through dinner, I went into the room where my aunt was and sat down; she was eating it; she said she had taken enough, and that it was very good, and asked if I would not take some; I took some of it and then put it down; I was talking to her but a few minutes afterwards, when I felt my head grow dizzy.

The counsel for the prisoner objected to any testimony by the witness as to the effect of the rice upon her. The objection was overruled by the court, and exception taken by the counsel for the prisoner.

The witness, among other things, further testified as follows: I went to my own room and commenced vomiting; as I left my aunt's room I handed her a basin, and she was then vomiting; I continued to vomit until half-past five or six o'clock; my aunt got up in her night dress and came into my room, and told me that Bella had just come home from school, had eaten the rest of the rice, and she was vomiting also; my aunt

said she would send for the prisoner; he said he would go for an emetic for me, and I said I could not take any; he insisted upon it and I refused, as I was then exhausted from vomiting; Mrs. Stephens had taken Bella into bed with her; Bella had vomited; I told him what my aunt said, that the child was vomiting; he went in, and when he returned to me he said the child was better; he gave me two glasses of salt and water, and said when I had vomited all off I would feel better; I do not know of his doing anything for Mrs. Stephens; before Mrs. Stephens ate this rice, I was conversing with her.

*Q.* What was the subject of that conversation?

Objected to by prisoner's counsel. Objection overruled by the court, and an exception taken by prisoner's counsel.

*A.* On the subject of my sister's marriage with Mr. Cardwell.

The witness further testified, among other things, as follows: My aunt was better the day she took the rice, before she took it; I lived with the prisoner from the time I came to New York until after my aunt's death; I observed the conduct of the prisoner and wife towards each other; the prisoner's conduct towards his wife was not generally what I would expect from a husband; if she offered to give her advice, he always objected, and said she was not capable, and used harsh expressions towards her; he would tell her to hush up, that she did not know; that he knew better than she—to dry up; sometimes he called her a fool and a liar, and said she was telling lies; she wanted to attend the funeral of John Stephenson's mother; she insisted upon attending the funeral with him; he dressed himself; she wanted him to wait for her; he refused, and struck her, and she called murder; this occurred in the sitting room; Mrs. Stephens cried and held her handkerchief to one of her eyes; she said I was not to speak about the prisoner's striking her; immediately after receiving the blow, it looked red around the eye, and then green black; traces of this black remained until her death; the prisoner's conduct was generally rough; his language was rough; his treatment to my aunt was not such as a wife should receive;

when she spoke to him about anything, he would put up his clothes and tell her he was going to go away and leave her; I heard him wish that he had never seen her; I heard him wish that she was out of the way; I heard him once or twice wish that she was dead; this was about six weeks before she died; two or three times when he threatened to leave her, he had stopped out late, and when he came home he said he had a very pleasant time, and talked of the young ladies that were there; she talked about it, and was angry about it; then he packed up his clothes and got them all ready to leave in the morning; my aunt's age was 46 at the time of her death; I heard him say he was 32; his bad treatment commenced about six months before my aunt's death, and grew worse until she died; the prisoner always went to the druggist's to have Dr. Iremonger's prescriptions filled; I saw the prisoner give my aunt powders and laudanum; he gave her powders the Monday evening before she died; she appeared a good deal better all that day, and when he returned with the powders she said that if she did not take any medicine she would soon get well; that every time she took the medicine she got worse, and said he would not leave the room until she took it; she took one that he prepared for her; then she vomited, and her bowels were changed; these powders were white and yellow; they were in two papers and he mixed them; my aunt was in bed when he did this; some days before this time, he had four or six powders in a box; he put these powders in a closet, and they were there after aunt died; I never saw the prisoner bring powders into the house but twice; I first saw laudanum on the morning of Tuesday, the day before my aunt died; it was an ounce vial, and labeled Shipley and Vanderhoof, corner of Thirty-third street and Third avenue; he poured the laudanum into drinks that he gave to Mrs. Stephens; my aunt was in bed at that time, and the prisoner was in the sitting room and the other room when he did this; he put this first ounce into lager beer and then in brandy, and gave it to her to drink; when this first vial was used up, he went out and returned with another bottle of laudanum; I saw him pouring

Stephens *v*. The People.

this laudanum into a glass with brandy; I asked him if this was laudanum he was giving her, and he said yes, that the doctor had ordered it; she objected to taking brandy, but he said the doctor told him to give her brandy for her bowels; the second bottle of laudanum was about the size of the first, and was labeled laudanum; it was from some drug store in Second avenue which I do not recollect; he administered this last bottle of laudanum to my aunt in brandy; when this bottle was used up he went out and returned with half a pint of brandy, and a lager beer bottle of laudanum, without any label upon it; it was nearly half as large again as this other bottle of laudanum; when he came in with this laudanum I asked him if that was laudanum; he said yes; I asked him if laudanum would take a person's life; he said yes, but that the doctor had ordered it for her—that it would not injure her, as her bowels were so bad; he said that the doctor had ordered it for her bowels, that it would ease the pain; he held this bottle of laudanum in his hands when he used these words; he said this laudanum is strong enough to take the life of three men, but that it would not injure her; he procured this last laudanum between 12 and 1 o'clock in the day; he gave this last bottle of laudanum in the last half pint of brandy; the first vial I saw about 9 o'clock in the morning; the prisoner administered her medicines during her sickness; he did not stay home with her all day, except the day before her death; he directed me to put a cloth as a signal when the doctor came, and when she was to get medicine, and I always followed his instructions; the prisoner was with her all day on Tuesday before my aunt's death; in the morning of that day he asked my sister Sophia to stop at Dr. Iremonger's, and ask him not to come; she refused; he said he would go himself; left the house, and was gone ten or fifteen minutes; I was not in my aunt's room all the day, except to look at her, until half-past six in the afternoon; Mrs. Hannah and the prisoner were in the room all that day; the prisoner said that I only excited her by going into her room—that it was better to let her sleep; the door leading into my aunt's room was nearly closed all

day; about half-past six the prisoner left my aunt's room and passed through the silting room; then I went into my aunt's room, and the prisoner came in; he said I had better come out again and not excite her; after that time she told me she thought she was going to die, and when she was gone she wished myself and Sophia to see to this; just then the prisoner came into the room; I did not administer any medicine to Mrs. Stephens; Mrs. Foley and another lady came to the prisoner's house the day my aunt, the child and I were sick from eating rice; the Sunday before my aunt's death a blister was applied to the pit of her stomach; she was vomiting most all that day; the vomiting did not relieve her; from the time she first fell sick, the prisoner said if her bowels changed, she would not live twenty-four hours after that; five or six months before my aunt's death, I noticed his paying particular attention to my sister. (Here the witness detailed what those attentions were.) The prisoner also told about Mr. Cardwell what I knew to be untrue; he also objected to her marrying Mr. Cardwell; he said that Cardwell was a low, shuffling, mean fellow—that he had sent his own daughter away from his house, and had poisoned his wife; this was after Mrs. Stephens' death, about a month; the prisoner continued to pay these attentions to my sister until we left the house; one night our cousin William Knox came into the room where I and my sister were sleeping, and lay across the foot of the bed, on the outside of the bed clothes; he kept his clothes on; William said the prisoner directed him to do so, and when I charged the prisoner with having sent William Knox, and told him that William had said so, he laughed and did not deny it; always when we wanted to leave the house, he brought this up to us; the prisoner administered to his wife, during her sickness, brandy, lager beer, porter, ale, milk and water, tea and coffee and lemonade; the first thing she complained of was an affection in her chest, a burning heat and red specks before her eyes, with dizziness; then she complained of a heat in her chest, and thought that her lungs were ailing; the heat was first in the pit of the stomach; she complained of this before Dr. Cad-

mus was called—in three or four days, I think; it was not severe then; afterwards she said there was a burning pain in her chest, like a ball of fire; the heat in her chest grew worse every day; she spoke of the burning pain after Dr. Cadmus called—perhaps two days; it increased every day during her sickness; I first noticed my aunt's vomiting shortly after Dr. Cadmus called; she did not vomit very frequently at first; the matter vomited was of a yellowish color; it presented this color for some days, when it changed, and became of a dark green color; then it seemed darker each time until she died; I saw the prisoner take the basin to the window two or three times, and there were red spots in it, and he said he thought it was part of her liver; something would always stay in her mouth; she would have to rinse it out; if you put a piece of wood or straw through the vomited matter, it would draw it up; she said she felt as if the ball of fire would come up from her chest to her throat; she was always thirsty, constantly wanting cold drinks; her countenance changed very much; she seemed very languid and anxious, and her eyes were considerably sunk; for two or three days preceding her death, she did not answer questions readily; her limbs grew weaker during her whole sickness; in the last week her hands were numb; she kept feeling everything, and trying to see if she had any proper feeling in her hands; her legs and feet became swollen; they began to swell two or three days before she died; they became cold; I felt them; she complained that she could not use her feet and limbs, and asked me to put something to them to warm them; she threw her arms around the bed almost constantly, catching hold of something; her lips were swollen; her face turned red; when diarrhea set in, just before her death, the discharges were of a dark color, and were very offensive; the diarrhea continued until about two hours before she died; it commenced about Monday night, at eleven o'clock, before she died; about a week before her death, there was suppression of urine, accompanied with pain, which continued until her death; her diarrhea was also accompanied with severe pain.

*John Cantrell*, called and sworn for the People, among other things testified as follows : I am an undertaker, and had charge of the funeral of the mother of John Stephenson ; it was about the twenty-eighth of August, 1857 ; I also had charge of the funeral of Mrs. Sophia Stephens ; it took place on the twenty-fourth of September, 1857 ; the prisoner, I think, gave me instructions about the plate on the coffin.

*William Scrimegeour*, called and sworn for the People, among other things testified as follows : I am superintendent of interments at Greenwood Cemetery ; by reference to my register, I recollect the burial of Mrs. Stephens on the twenty-fourth of September, 1857 ; the entry in the register is as follows : September 24th, 1857, the remains of Sophia Stephens were this day interred in lot number 9146 ; grave number 272 ; place of birth, Ireland ; age, 46 years ; married ; late residence, 166 East Twenty-seventh street, New York ; place of death, New York ; time of death, September 23, 1857 ; disease, inflammation of the stomach ; undertaker, John B. Cantrell ; Michael Dalton is my assistant, and was there ; when Professor Doremus came to remove some of the earth from the grave, I was present and saw the coffin, and the name and date correspond with what I have stated ; when we disinterred the coffin the second time for the removal of some earth around it, the coffin was enclosed in a box ; I did not see the coffin when it was disinterred by coroner Connery ; last Monday I had the coffin taken up and delivered to John Haley.

*Michael Dalton*, called and sworn for the People, among other things testified as follows : I am employed at Greenwood Cemetery under charge of Mr. Scrimegeour ; I received the corpse of Mrs. Stephens from him on the 24th of September, 1857, and interred it in lot 9146, grave 272 ; was present on the 23d of last September, when coroner Connery exhumed the body ; the two Misses Bell were also there, and identified the body ; the coffin containing the body was then put in a box, and taken away in a wagon by John Ward. The coffin was afterward re-interred, and subsequently again taken up, and some dirt from over and under the coffin taken away by a

gentleman; I do not think the grave had been opened after the corpse was buried, previously to the exhumation of the body; I was around the ground all the while; the coffin was taken up for the last time on last Monday, and delivered to John Haley.

*John Haley*, called and sworn for the People, testified as follows: Last Monday I went with an order from the District Attorney to Greenwood Cemetery, and received a coffin from Michael Dalton, the last witness, which I took to No. 133 East Eighteenth street, and delivered it to the person in charge there.

*Patrick Rielly*, called and sworn for the People, among other things, testified as follows: I knew Mrs. Sophia Stephens, and saw her twice while she was sick, the last time on Monday or Tuesday next before her death; she was lying on her back in bed; each time she said she was burning inwardly; the last time I saw her there was a red hue on her face and it was bloated up.

*Michael Flynn*, called and sworn for the People, testified, among other things, as follows: I am a druggist at 142 Second avenue; I know the prisoner, and knew Mrs. Stephens in her lifetime; I sold the prisoner half an ounce of arsenic about five weeks before his wife died; and about a week previous to that sale, sold him half an ounce more; for about three years previous to the second purchase of arsenic, the prisoner used to come into the store two or three times a week, but during the five weeks that intervened between that purchase and her death, do not recollect of his being in my place once.

The envelop in which was enclosed the anonymous letter received by Mr. Cardwell, was then shown to the witness, who thereupon testified as follows:

The direction on that envelop is in my handwriting; I directed it by request of the prisoner, who came in one evening, and asked me to direct it for him, and I did so; this was about May or June last, in the commencement of summer; after I directed the envelop, I gave it to the prisoner, who took it away with him.

The witness was not cross-examined.

*Walter L. Sandford,* called and sworn for the People, testi-
fied, among other things, as follows: I have visited the pre-
mises on the south side of East Twenty-seventh street, No.
166, formerly occupied by the prisoner; I also know the pre-
mises on the south side of East Twenty-sixth street, occupied
by John Stephenson; the window at the head of the stairs in
the premises, formerly occupied by the prisoner, could be seen
very plainly through a narrow alleyway between the houses on
the north side of East Twenty-sixth street from Stephenson's
factory; I tested the matter by putting a piece of paper in
that window, and then going round to Stephenson's factory and
looking; I could easily see the paper.

*John Ward,* called and sworn for the People, among other
things, testified as follows: I am an undertaker, and on the 23d
of September last, went with coroner Connery to Greenwood
Cemetery; the two Misses Bell, Robert Bell and another gen-
tleman also went; when we got there a grave was opened, the
coffin taken up and opened, and the body was recognized by
the Misses Bell as that of their aunt; I then took it to the
Bellevue Hospital, and they again recognized it; it was then
put in the dead house at the hospital, and about the third of
October the coffin and a part of the body were re-interred in
the same grave.

The witness was not cross-examined.

*Joanna Brandon,* called and sworn for the People, among
other things, testified as follows: I knew Mrs. Sophia Stephens
in her lifetime, and saw her several times during her sickness;
the first time was about two weeks previous to her death; she
was then sitting up in the outer room, in a chair facing the
window, and I saw distinctly that she had a very bad looking
eye; it was black around it; did not see the discoloration
at my subsequent visits; she was then in bed and her face was
shaded; during my visits she appeared to be in great pain, and
she complained of a burning sensation in her chest and throat,
nausea and sickness of the stomach; she said it seemed as if
she had a rolling ball of fire in her chest, and if she could put

her hand down and pull it up she would be relieved; previous to her sickness, Mrs. Stephens appeared to be a healthy looking woman; I noticed her particularly, and she looked so to me.

*Mary Pullman,* called and sworn for the People, among other things, testified as follows: I knew Mrs. Stephens in her lifetime, and visited her twice during her sickness; she was very much distressed when I saw her, and said she was constantly sick in her stomach, and could keep no food upon it; the last time I was there was the evening before her death; I only went into the outer room and did not see her; Mrs. Stephens was sleeping so heavily, and breathing so hard, that I could hear her in the outer room, and I remarked to one of her nieces that she should not let her sleep so heavily long at a time, that a person so weak should be roused frequently.

*Daniel R. Stuart,* called and sworn for the People, among other things, testified as follows: I reside at 166 East Twenty-seventh street, and did when Mrs. Stephens died, on the floor next under that which the prisoner occupied; I lived there a year and a half before she died, and used to see her about every day; I always thought she was a pretty healthy woman; she went round barefooted, and I thought she was pretty healthy, or she would not do that; she died between two and three o'clock in the morning.

*James R. Wood,* called and sworn for the People, among other things, testified as follows: I am a physician; reside at No. 2 Irving place; I made a *post-mortem* examination of Mrs. Stephens in Bellevue Hospital, in presence of Dr. Doremus, Coroner Connery, and several others, on 24th September, 1858, about noon; found the body in a remarkable state of preservation; the face and scalp were in an advanced state of decomposition; the viscera were apparently healthy, and in an excellent state of preservation; the viscera were removed and handed to Dr. Doremus; I took the body from a coffin, upon the plate of which I found the following: " Sophia Stephens, died September 23d, 1857, aged 46." The skin was of a

dirty yellow color; the internal lining of the intestines was in a remarkable state of preservation; the internal surfaces of the lower part of the large intestines, rectum, and portion of the descending colon were reddened; this was an indication of congestion or inflammation of some period prior to death; on examining the muscular tissues of the body, I found they had not lost their coloring matter; the mucous membrane of the stomach was shrunken and much harder than usual; there was an unusually small quantity of contents of the stomach; the bladder was much shrunken.

The witness being recalled at another stage of the trial, among other things, testified as follows: Arsenic may be taken into the stomach, and the person die, without any change taking place in the stomach; if arsenic was taken in large quantities, there might be vomiting, and death occur after many hours, and inflammation might be discovered in the stomach; there might be inflammation of the colon and rectum; ulceration and perforation of the stomach are very rare, as a consequence of arsenic; the kidneys are the chief eliminating organs of arsenic; and, from the irritating effects of the arsenic causing a flow of blood to them, might be congested, and suppression of urine follow; the brain rarely suffers, and generally the mind is clear and serene; arsenic has an effect upon the nervous system, as shown by great prostration, feeble action of the heart, and hence a feeble pulse, with a contracted hypocratic countenance; death may occur from arsenic, and there be no morbid appearance of the body; some of the nervous effects are want of sensation, numbness and paralysis; sometimes there is an inflammation of the mouth and lips; there was no idea of subjecting the whole body to chemical examination until it was taken to the hospital by Dr. Doremus; I gave directions that no one should touch the body; Dr. Phelps had a key to the room, but it was not used, as I am informed by him; such a body could not be injected for anatomical preservation.

*Robert Ogden Doremus*, called and sworn for the People, among other things, testified as follows: I reside at No. 70

Union place; am professor of chemistry in the New York Medical College, and in the College of Pharmacy, and Professor of Natural History in the Free Academy; on the 24th September, 1858, I was present with one of my assistants, Dr. Zenker, when Dr. Wood made a *post-mortem* examination of a female, after she had been recognized by the Misses Bell; the body was removed from a well preserved coffin, on which was "Sophia Stephens, died September 23d, 1857, aged 46 years;" I received from Dr. Wood the viscera, and placed them in new and clean glass jars ; these were conveyed to my private laboratory, and afterward chemically investigated; arsenic was found ; in several small parts of the liver and kidneys, varying from two to eight ounces, arsenic was discovered; the intestines were nearly empty, containing a thin film of a yellowish pasty substance, about one-half of a teaspoonful in quantity ; I examined this chemically, and ascertained the presence of arsenic; seven pounds and three ounces of the viscera were examined, and yielded arsenic; I examined the muscular tissues, and discovered in it arsenic, also in the skin and bones; I estimate I discovered two grains of arsenic; there is a certain amount of loss in the processes, and I think there was from four to six grains of arsenic in the body; all the vessels and instruments used in this analysis were new ; all the acids were thoroughly tested before being used, and all the chemicals of every kind were likewise ; I analyzed the shroud, part of the coffin, part of the lining of the coffin, some of the nails and screws of the coffin, and three samples of the soil of the grave from which the body was taken, but detected no arsenic; arsenic, when taken into the system, is removed chiefly by the kidneys ; it begins to be removed within twenty-four hours; arsenic is not a natural constituent of the human body; a fatal dose of white arsenic may be as small as one grain, $1\frac{1}{4}$, $1\frac{7}{10}$, $1\frac{8}{10}$, two grains, three grains, and four grains, as reported.

*William Detmold,* called and examined for plaintiffs, among other things, testified as follows: I reside at No. 103 Ninth street; am a physician and surgeon; symptoms of arsenical

poisoning vary according to the quantity taken and the condition of the system; the most ordinary are vomiting, sometimes stained with blood, intense burning pain, generally in pit of stomach, but extending upward and downward; the belly tender to the touch; the pain as far down sometimes as the anus, and upward to the chest; at times making mouth sore; diarrhea will in a great number of cases exist, and after a while the discharge will be slightly tinged with blood; generally an exceedingly anxious countenance; frequently a sunken eye; in some cases a brilliant wild expression of the eye; excessive prostration; the pulse quick and feeble; limbs powerless; sometimes paralyzed, and loss of sensation; extremities numb; urine of a high color, scanty, and sometimes suppressed; the mind is free; in rare cases delirious; sometimes there are convulsions, even rigidity and a failing of the extremities; frequently there are illusions and visions.

*Q.* In a case in which such symptoms as will be detailed to you should occur, and after death such appearances of the body; and upon a chemical examination such a result as will be detailed, what, in your opinion, would be the cause?

Counsel for prosecution, at request of the prisoner's counsel, stating that the opinion of the witness was sought upon symptoms as follows: "Sickness of two weeks; appearance of redness before the eyes; dizziness and burning of the chest, felt as if a ball of fire were moving up and down in the stomach, continuing to increase until death; complaint of the burning being from bottom of chest and coming up to throat; vomiting through the course of the sickness; vomiting with great pain after eating and drinking; color of the vomited matter first yellow, continuing so for some days, then of a dark green color, getting darker and darker until death; vomited matter containing red spots, and appearance of little pieces of flesh on one side of the basin; mucus in vomited matter; pain in the pit of stomach, increased by pressure; extreme thirst, drinking all the while, and drinking everything cold; countenance

Stephens *v*. The People.

changing, becoming very anxious, languid, careworn and fatigued; the eye sunken; piercing expression; eyes having a sharp look; she a great deal debilitated; weakness of the limbs; numbness of the hands; coldness of the legs and feet for a week before death; two or three days before death legs and feet were swollen and cold; clinching her hands and feeling for something all the while; anxiety to use hands and feet; having no power in her hands and arms; the whole side numb night before death; two or three days before death not answering questions readily; convulsed movements of the arms; constantly throwing her arms about the bed, catching hold of things; her lips swollen; one week before death suppression of urine, continuing until death, it being connected with pain; the discharge of fæces with great pain, and of a dark color of a very offensive kind, and mixed with blood; cold perspiration on her hands; drowsiness in the last part of sickness; great stupor and lassitude immediately preceding death; about two hours before death giving a horrid scream, and sinking away in exhaustion; growing weaker the longer she was sick."

Objected to by prisoner's counsel, on the ground that the prosecution had no right to ask a supposititious question.

Objection sustained by court, and question overruled.

*Q.* Of what are the following symptoms indicative?

Counsel for the prosecution going on to name to this witness such symptoms as had been stated by the witness before the jury in this case.

Objected to, and objection sustained.

Among other things, the witness further testified: The vomited matter, after the stomach was emptied of its contents, would be of a yellowish color, with spots and streaks of blood, and if there was a good deal of blood it might assume a darker color—it might be of the color of coffee grounds; restlessness is a frequent symptom; in most cases death occurs under collapse; cold, clammy skin, weak pulse, gradual sinking, at times come; the kidneys begin to remove the arsenic in from ten to twenty-four hours after being taken; arsenic is

a preventive against putrefaction; I believe no matter how much arsenic is introduced into the stomach, only a moderate and limited amount will be absorbed, that is, will enter the blood; when a certain amount is reached, the patient will die; we may introduce as much as we please into the stomach, the system will not absorb it.

*B. Fordyce Barker*, called and sworn for the People, among other things, testified as follows: I reside at No. 70 Union place; am a physician; acute arsenical poisoning is where the effects are comparatively speedily produced; the symptoms are faintness, depression, nausea, vomiting, pain at the pit of the stomach, extending up to the throat, of a very burning character, and partially extending over the abdomen; another class of symptoms is due to the effects on the nervous system, viz., exhaustion, collapse, sometimes coma and death; frequently before death there is a loss of sensation, sometimes palsy, sometimes convulsions; in chronic poisoning the symptoms are local irritation, nausea, vomiting, gradually and more slowly developed; the pain in the stomach and throat still retains its burning character; partial paralysis is a frequent symptom; the matter vomited is frequently streaked with blood; the evacuations of the bowels resemble those of dysentery, painful and very frequent, burning heat and irritation at the extremity of the bowels; the stomach and abdomen are sensitive to pressure; a characteristic symptom is intense, urgent and constant thirst; the character of fæces varies; sometimes they are with blood, and sometimes they are with mucus; sometimes thin, feculent and watery, of a dark color; the countenance becomes sunken, with an anxious expression; the pulse becomes feeble and rapid; the surface becomes cold and clammy, the patient restless and anxious, with loss of sensation, coma and death; the passage of urine and of the evacuations of the bowels are accompanied with pain; arsenical poison stimulates inflammation of the stomach or of the bowels, cholera or cholera morbus; the pain, in inflammation of the stomach, is accompanied with active fever; in poisoning, the pain is complained of in the track from the stomach to the throat, as a

burning, while in inflammation of the stomach it is at the seat of pain; in inflammation of the stomach it is not followed by loss of sensibility, paralysis, or incessant vomiting; in cholera morbus the difference is, that the vomiting is not accompanied with a burning sensation in the stomach and throat, and is not followed by loss of sensation or paralysis; bilious colic can hardly be mistaken for arsenical poisoning; there is a constipation of the bowels, and it is not attended with vomiting; arsenic has a tendency to retard putrefaction; there have been cases of death from arsenic, when no arsenic has been found in the stomach or any of the tissues of the body; arsenic does not exist as a natural constituent of the human body; the existence after death in the body of a certain quantity of arsenic, is proof that a greater portion has been taken into the system; laudanum would not neutralize the effects of arsenic, but would mask the symptoms.

No *cross-examination.*

*Benjamin W. McCready,* called and sworn for the People, among other things, testified as follows: I reside at No. 8 Ninth street; am a physician; the symptoms of arsenical poisoning vary; commonly the effect begins within half an hour; the patient is seized with sickness, pain and vomiting; the burning is seated at the pit of the stomach; it may extend along the track of the gullet; the vomiting is incessant; there is intense thirst; after a time the bowels are acted upon; there is diarrhea as a rule, accompanied with a great deal of pressing and bearing down; there is often a frequent call to pass urine, it being diminished in quantity and sometimes suppressed; there is a great general depression; the patient becomes pale; countenance anxious; the pulse frequently feeble, and finally lost, and the eyes often reddened; the patient may die with these symptoms, or, in a very rare class of cases, may die simply from the nervous effects of the arsenic, by faintness—sometimes convulsions, sometimes coma, passing into a deep sleep which ends in death; these two classes of symptoms are often mixed, the irritant and nervous effect being mingled; sometimes you have palsy, loss of feeling in some of the limbs,

convulsions, in few cases delirium; the mind is commonly clear; the vomit is covered with yellow or green bile; the bile may be still darker, and it may be streaked with mucus and blood in specks; the pain in the stomach is increased by pressure; the prostration is very great; the discharges from the bowels may be streaked with blood; if, after a poisonous dose of arsenic has begun to take effect, laudanum were administered, it is exceedingly probable that it would take a very much larger dose of laudanum to produce the usual effect upon the system than it does ordinarily; whenever there is a very acute pain, violent vomiting and purging, and in certain diseases of the nervous system, large doses of opium may be borne; arsenic is not a natural constituent of the human body; if I found two grains in a body, I would feel morally certain that a much larger dose had been given.

*Alanson Jones,* called and sworn for the People, among other things, testified as follows: I reside at 42 University place; I am a physician; the common symptoms of arsenical poisoning are, that within two or three hours after the administration of the poison, great faintness comes on, then pain in the pit of the stomach, described commonly by patients as being like fire, nausea, constant vomiting, intense thirst; the pain being at the pit of the stomach, extends itself all over the belly; diarrhea then ensues, the purging is constant and violent, with a great strain and effort, in my experience; the discharges have been very offensive, and sometimes streaked with blood; generally there are streaks of blood in the vomited matter; death is usually preceded by collapse, and utter cessation of the vital powers, coldness, small pulse; usually there are cramps, spasms and paralysis in some portions of the extremities, and numbness; the disease most nearly resembling arsenical poisoning is Asiatic cholera; in cholera, however, the vomited matter does not contain blood; there is usually no great straining; the discharges are not offensive, and not streaked with blood; there is not great tenderness to the touch upon the abdomen in cholera, as there is in arsenical poisoning; under ordinary cir-

NEW YORK, MAY, 1859.          439

Stephens v. The People.

cumstances, the average quantity of arsenic necessary to cause death would be three grains, but there are cases upon record where much smaller quantities have caused death.

*Edward Downes Connery*, called and sworn for the People, among other things, testified as follows: I am a physician; have been coroner of the city of New York; I held the inquest on the body of Mrs. Sophia Stephens; I first saw it in Greenwood Cemetery; upon the order of the District Attorney and Justice Welch, I went to Greenwood with the Misses Bell and others, and Mr. Ward, an undertaker; I employed a person to dig the earth, after having procured the number of the grave; on coming to the coffin, I ordered the inscription on the coffin-plate to be read; I asked the Misses Bell if it were correct; they said yes; the coffin was opened; the Misses Bell identified the body of Mrs. Stephens; the coffin was placed in a hearse and brought over to Bellevue Hospital, and put in charge of Dr. Wood, Mr. Daily and others; the Misses Bell then again identified the body of their aunt; on the occasion of making the *post-mortem* examination of the body by Dr. Wood, I was present and saw the body; it was again identified by the Misses Bell.

*Ann Fee*, called and sworn for the People, among other things, testified as follows: I am the wife of John Fee; knew Mrs. Stephens over seven years; before she was taken sick she visited me, and sat in my room about six feet from the window; I noticed that she had a black eye; that day she complained of a pain in her chest; afterwards she called to see me again, and said she must go home to see the doctor; she said, " What do you think James has been doing? he has been sending Dr. Cadmus to see me."

*Catharine Meehan*, called and sworn for the People, among other things, testified as follows: I knew Mrs. Stephens, and called to see her ten days before she died; she told me she was afraid she would not recover, for her throwing up was not natural; she then handed me the basin she used, and said, look at that; it looked yellowish and blackish.

The witness being *cross-examined,* among other things, testified as follows: I always knew the prisoner and his wife to live happy as I knew them, and comfortable.

The witness being further examined for the People, testified as follows: I have no knowledge as to how they lived, except what I have heard.

*Maria Foley,* called and sworn for the People, among other things, testified as follows: I knew Mrs. Stephens, and visited her during her sickness; one afternoon I was there and saw her little daughter, Bella, sick and vomiting; Mrs. Lucina Stephens was with me.

*Lucina Stephens,* called and sworn for the People, among other things, testified as follows: I knew Mrs. Sophia Stephens, and called to see her with Mrs. Foley; Mrs. Sophia Stephens was sick in bed, and her little girl was sick and vomiting.

*John O'Brien,* called and sworn for the People, among other things, testified as follows: I am keeper of the dead house at Bellevue Hospital, and was there when the body of Mrs. Stephens was brought there; my assistant, John Sweeny, was also there; Dr. Wood and Coroner Connery were also there; Sweeny and John Ward, who drove the hearse, carried the body into the house; the coffin was opened, and the Misses Bell looked at the body; the body was then locked up that night in the city dead room, and no one had access to it; I refused to let anybody see it; the next morning it was carried by Sweeny, another man and myself, up stairs to the pathological room, where the *post-mortem* examination was made; I did not allow any person to see the body previously; Dr. Wood and coroner Connery were there when the body was taken up; I was not present all the time when Dr. Wood was there; Dr. Doremus was also there, and took some parts of the body away in glass jars; the rest of the body remained on the table where the *post-mortem* examination was made; I kept the key, and when I was not there Sweeny had it; there was another door to the room, and Dr. Phelps kept the key to that; one Sunday I was away, and when I returned Sweeny told me Dr. Doremus had taken the body away; while it was there I

Stephens *v.* The People.

did not allow any person to go in and see it unless I was with them; I did not allow any person to touch it or interfere with it in any manner, except Drs. Wood or Doremus, or persons in their company.

*John Sweeny*, called and sworn for the People, among other things, testified as follows: I am employed at the Bellevue Hospital, and help John O'Brien; he kept the key of the room, except when he was absent, which was very seldom; when he was, I kept the key, and did not allow any person whatever to go in to see the body.

*Robert Bell*, called and sworn for the People, among other things, testified as follows: I am a brother of Sophia and Fanny Bell; I was present when they recognized the body of our deceased aunt, Mrs. Stephens; I also recognized the body; I never interfered with the body in any manner, except that once in the presence of Dr. Wood, who was showing some gentlemen how hard the body was, I put my finger on it to try the solidity of the flesh; the internal portion of the body had previously been taken away by Dr. Doremus.

*John Fee*, called and sworn for the People, among other things, testified as follows: I met the prisoner four or five days before his wife died, and he said that she was very poorly; after that he said he thought she was getting better; I was at his house on the morning of the day that the mother of Mr. John Stephenson was buried and saw the prisoner's wife; she did not have a black eye; I looked at her, and would have noticed it if her eye was injured.

*Adam Zenker*, called and sworn for the People, among other things, testified as follows: I reside at 433 Houston street; am a physician; went with Dr. Doremus to Bellevue Hospital in this case; saw Dr. Wood make the *post-mortem* examination of Mrs. Stephens' body; Dr. Wood cut out and gave to me and Dr. Doremus, part of the liver, part of the lungs, the stomach, fastened in both orifices, the small and large intestines, colon and rectum, pancreas, bladder and uterus, spleen, gall-bladder and part of the brain; we placed them in clean and new glass jars, covered with oil silk; I assisted Dr. Doremus in analyz-

ing these viscera; we discovered arsenic; we produced metallic arsenic from them; all the acids used on this analysis were tested for hours, and all the salts, &c.

*Bern. L. Budd*, called and sworn for the People, among other things, testified as follows: I live at 143 East Thirteenth street; am a physician, and have pursued the study of toxicological chemistry especially; I opened the intestines of Mrs. Stephens' body; we removed from them about half a teaspoonful of substance; on 3d October went with Dr. Doremus to Bellevue Hospital; found the body said to be Mrs. Stephens' lying in the Pathological Museum on a table; assisted in removing it to the New York Medical College; assisted them in removing the soft parts from the bones; some muscular tissue remained upon the bones, which was afterwards removed by me from the spinous processes and under the shoulder blade; I assisted in the analysis of this last at a laboratory hired for this purpose by Dr. Doremus; all the acids and material used in this analysis were there prepared, to insure their purity; the vessels employed were new; the laboratory was sealed always upon leaving, and the seal examined and found unbroken on entering; metallic arsenic was discovered by this analysis; we also analyzed with similar precaution the skin and bones of the body of Mrs. Stephens, at the laboratory in Eighteenth street; metallic arsenic was also found in them; arsenic is not a natural constituent of the human body; I have looked into the subject of arsenic eating; Christison, Taylor, Pereira, and Wharton and Stille discredit it; I received from Mr. John Haley, at 113 East Eighteenth street, a coffin, portions of which were afterwards analyzed; I have the plate of that coffin. (Witness here produced a coffin plate, and read: "Sophia Stephens, died September 23, 1857, aged 46 years.")

*Charles Phelps*, called and sworn for the People, testified as follows: I am a surgeon at the Bellevue Hospital; when the body of Mrs. Sophia Stephens was at the dead house, I had a key to the room in which it was kept; I did not allow any person to use the key, nor did I do anything to the body.

The prosecution here rested.

Stephens *v.* The People.

*Isabella Jane Stephens* (child of the prisoner, examined for the defence), called and examined by the court as to her understanding of the nature of an oath:

*Q.* How old are you? *A.* Seven years. *Q.* Do you know what is meant by taking an oath? *A.* Yes, sir. *Q.* Do you go to Sunday school? *A.* Yes. *Q.* How many years have you gone? *A.* I do not recollect. *Q.* Did you go to Sunday school last winter? *A.* Yes, sir. *Q.* And the winter before that? *A.* Yes. *Q.* Suppose you were to swear here, and tell an untruth, what would become of you? *A.* I would go to hell fire. *Q.* Who told you that? *A.* My father. *Q.* When did your father tell you that? *A.* I do not remember. *Q.* Do you know your catechism? *A.* Yes. *Q.* What Sunday school did you go to? *A.* Twenty-seventh street Sunday school. *Q.* What catechism have you learned? *A.* The first and second.

Court. If the prisoner wishes it, I am disposed to allow the witness to be examined, and let her testimony be taken for what it is worth.

The witness was then sworn and examined for the prisoner, and testified, among other things, as follows: I saw Fanny Bell give my mother medicine; I saw her give powders; she got them out of the clock; she gave her powders twice; she gave them out of a tablespoon; I was sick; it was while my mother was sick in bed; I was made so by eating flummery; it was made by Fanny Bell; it was on a Tuesday; cousin Fanny Bell gave it to me; Fanny Bell was not sick that day; she was sick on Friday; it was cold cabbage made her sick; Fanny Bell called my mother a liar; she also tried to hit my mother with a bench.

The witness being *cross-examined*, among other things, testified as follows: My cousin, Isabella Bennett, told me that I was made sick by eating flummery, and my cousin Fanny Bell by eating cold cabbage; she also told me she called my mother a liar, and tried to hit her with a bench; that is the way I know these things; I told them to Mr. Ashmead, at his house, last Sunday; I know Fanny Bell gave my mother powders,

because she took them out of the clock; I did not see my mother take them.

The *direct examination* being resumed, she was asked:

" Who used to go errands when your mother was sick? any of them?"

The counsel for the prosecution objected to the question, but it was allowed by the court.

When the counsel for the prisoner refused to put it to the witness, whereupon it was put by the court, and the witness answered as follows:

" Sometimes my cousin; sometimes myself."

*Susan Hannah,* called and sworn for the defence, testified, among other things, as follows: I am the wife of James Hannah, and sister to the prisoner; I called to see Mrs. Stephens every day during her last sickness; prior to that time her ancles used to swell a good deal; they were swelled sometimes, and then the swelling would go away; two years before her death, Mrs. Stephens had an attack of heaving off her stomach, and she was always subject to such attacks; my husband purchased arsenic of Michael Flynn, at Dr. Cadmus' store; Flynn was a clerk there; the prisoner was with him; I waited on the sidewalk until they came out; it was in the month of July, next before Mrs. Stephens died; he got three cents' worth; he took it home to our house, and mixed it there for rats; he afterwards brought home three cents' worth more.

The witness being *cross-examined,* among other things, testified as follows: At the time my husband first purchased arsenic we were living in Clark's house, corner of avenue A and Twenty-third street, next the East river, on the right hand as you go down Twenty-third street; after we returned home my husband sprinkled the arsenic in an old broken plate, with some potatoes, or something else; we lived on the fourth floor; I used to put things in the cellar, and the rats would seize them; my husband put the arsenic in the cellar, where we kept our butter and cheese; we bought butter and cheese in quantities at Washington market; each family had their own cellar partitioned off with boards; our cellar was locked; I

locked it myself, when he put the arsenic in; I did not see much of the rats after the poison was mixed and left in the cellar; I was sworn and examined as a witness before the coroner's jury; I did not there testify as follows : " When I went there I used to go occasionally into the sick room ;" I did not there testify " that Mrs. Stephens' nieces were always in the sick room ;" I did not there testify " that Fanny Bell was the principal attendant upon Mrs. Stephens ;" I did not there testify as follows : " She expressed a desire to take no more medicine ;" I did not there testify " that I did not get so close to her as to find out whether it was laudanum or not ;" I did not there testify " that Mrs. Stephens died about half-past two o'clock in the morning ;" I did not there testify " that I was in the house the day before Mrs. Stephens died until about six o'clock in the evening;" I did not there testify as follows : " I returned at eight o'clock, and remained until she died ;" I did not there testify as follows: "I gave her drinks, lager beer, ice water," &c., nor did I think of it; I did not there testify as follows: " My brother gave nothing to Mrs. Stephens the day before she died but milk and water ;" I did not there testify as follows: "All the matter vomited by Mrs. Stephens was yellow, green and other colors," not to my recollection.

The witness further testified as follows : the coroner would only hear me speak what he asked me; I would not be let speak anything else.

*Isabella Bennett,* called and sworn for the defence, among other things, testified as follows: I am daughter of James and Susan Hannah; I was not married when my aunt died; I have since been married to John Bennett, about four months since; my aunt, Mrs. Stephens, was confined to her bed about two weeks before her death; I went there on Tuesday, and remained one week, until the Tuesday that she died; I was there all the time that week, and stayed there at night; my aunt sent for me to go of errands, and do things for her; I was there until four o'clock of Tuesday; I saw Fanny Bell give my aunt one powder; it was three or four days before her death.

The witness was here examined particularly as to the symptoms of Mrs. Stephens' last illness.

I know William Knox; I went to the prisoner's house one evening.

*Q.* Did you ever see him in, or on or about the bed where the Bell girls were?

The counsel for the prosecution objected to any testimony in relation to Knox and the Misses Bell, except as to the occurrence proven on the part of the People.

The court said that it would allow the evidence; but if the defence proved other transactions, the prosecution would be allowed to call witnesses as to such matters.

The witness then testified as follows: I went to the prisoner's house one evening, about five months after the death of my aunt; I went to church with Fanny Bell, and when we came back William Knox was there; he remained until we were going to bed; I saw Fanny and Sophia undress themselves and go to bed; they left me sitting in the rocking-chair in the sitting room; my uncle and his little girl were in bed in his own room; I saw William Knox take off his boots in the sitting room, and go into the bedroom where Fanny and Sophia Bell were in bed, and get over right near the wall where Fanny was sleeping, right next to Fanny; then my uncle spoke out of his bed, and asked me why I did not go to bed; I asked him where would I go; he said come and sleep with me and Bella, and I did so; when I got up in the morning William Knox had gone away; at another time, while Knox was boarding there, I went over one evening to the prisoner's house; while William Knox and the prisoner were out, I went and got under their bed; I remained there until after they went to bed; after they were in bed about an hour, William Knox jumped out of bed where he was lying, and ran into the girls' bedroom, and went to bed there; he was undressed; Sophia then got out of the bed, leaving Knox and Fanny there in bed; then Sophia came and got into my uncle's bed; Sophia remained there about twenty minutes or half an hour, when Knox came back into my uncle's bed, and Sophia went

out; I was under my uncle's bed all the time; my uncle was undressed the night I slept with him.

The witness being *cross-examined*, testified, among other things, as follows: I was sworn and examined before the coroner's jury; I did not then testify on the subject of scouring the floor after Mrs. Stephens' death; I cannot remember whether or not I testified before the coroner's jury as follows: "I was in and out of the house while Mrs. Stephens was sick;" I do not remember whether I there testified as follows: "My mother gave my aunt a drink;" I do not remember whether I there testified or not as follows: "I saw my uncle give my aunt a drink;" I cannot answer your question whether I there testified as follows: "My aunt used to throw up a few minutes after drinking."

The signature, "Isabella Hannah," to deposition of coroner's inquest, is here shown to the witness, whereupon the witness testified as follows: I wrote my name at the coroner's jury; I cannot say whether that signature is mine or not; I have examined, and cannot say whether it is or not; I was at home part of the time when my parents resided at avenue A, corner of Twenty-third street, in Clark's house; the families in the house had butter and such things in the cellar in the warm time of the year; I have seen my mother have butter there; I have also seen a lady by the name of Kirk, who lived on the floor under us, have butter in that cellar; she has gone to some part of the country, but I do not know where.

*Maria Hannah*, called and sworn for the defence, among other things, testified as follows: I am the daughter of James and Susan Hannah, and niece of the prisoner; During Mrs. Stephens' last sickness, I was at her house occasionally, twice, and sometimes three times a day; the last time was on the night of her death; I was there in the morning, afternoon and evening of that day; also the afternoon and evening; Friday in the morning and afternoon, Thursday morning and afternoon; Wednesday not all, and on Tuesday, a week before her death, in the afternoon and evening; my sister, Isabella Bennett, remained there from that Tuesday until the evening of

my aunt's death; since I first knew my aunt, I have known her to be subject to throwing off, even when she was apparently in health; on the Monday before my aunt's death, I saw Fanny Bell give my aunt a powder. (The witness here described particularly the symptoms of Mrs. Stephens' last illness.) I know William Knox; about two months before the Misses Bell left the prisoner's house, I went over there one Sunday morning, between six and seven o'clock, and saw William Knox and Fanny Bell sleeping together in her bed; Sophia was sitting in the rocking chair, asleep, with her shawl around her; I waited there for breakfast; William Knox went away as soon as he got dressed; at the table my uncle said they must stop such conduct, or leave his house; in July or August, 1857, my father had arsenic at his house to kill rats; he put it in the cellar; we used to keep butter, cheese and cold meat there.

The witness being *cross-examined*, testified, among other things, as follows: I was sworn and examined as a witness before the coroner's jury.

The signature, "Maria Hannah," to deposition on coroner's inquest, is here shown to the witness, whereupon the witness says: I don't know whether that is my signature; I will not swear to my handwriting; I will not say that it is not my signature; I do not remember that I there testified as follows: "For three weeks previous to Mrs. Stephens' death, I called there every other day;" I did not there testify as follows: "She departed at about ten minutes past two the following morning;" I do not remember that I there testified as follows: "I did not see her get any medicine or drink during this time;" I did not there testify as follows: "I saw my mother wet Mrs. Stephens' lips once with water; I did not see anybody else apply anything else to her lips;" I did not there testify as follows: "Half an hour previous to my aunt's death, my uncle threw himself on the bed in the next room;" at the coroner's inquest, coroner Connery would not allow me to speak one word; he did not tell me to tell all that I knew concerning the sickness and death of my aunt; my parents kept butter, cheese and meat in the cellar of Clark's house, all the

Stephens *v.* The People.

while for two or three months; Mrs. Kirk also kept food in that cellar; she has moved into the country, but I do not know where she is; a gentleman who boarded with her told she had moved, but I cannot tell how long since he told me.

*Catharine Stewart*, called and sworn for the defence, testified, among other things, as follows: "I reside at No. 166 East Twenty-seventh street; my husband's name is Daniel Stewart; I visited Mrs. Stephens during her last sickness, two or three times; she said she had a burning in her stomach and a throwing off; I do not know of her being sick at that time, only she felt bad and weak when she went up stairs.

The witness being *cross-examined*, testified, among other things, as follows: I saw the prisoner give his wife a drink; I think it was the day before she died; it might have been two days; it was the color of coffee or brandy; I thought it was the one or the other; she got out of bed as soon as she drank it, and threw it up.

*George Davis*, called and sworn for the defence, testified, among other things, as follows: I reside at No. 451 Second avenue; am a book-keeper; I am a class leader in the Twenty-seventh street Methodist Church, of which I understood the prisoner and wife were members; I visited Mrs. Stephens from six to a dozen times during her last illness. (The witness was here examined in relation to the symptoms of Mrs. Stephens' sickness, especially on the last night.) During Mrs. Stephens' illness, I did not consider Fanny Bell attentive to her; it seemed to me that she was neglected by the Misses Bell.

Being *cross-examined*, the witness, among other things, testified as follows: I do not remember seeing any bottles or phials standing around the night Mrs. Stephens died; I was sworn and examined before the coroner's jury; the signature "George Davis," is mine; I cannot swear now whether or not I testified before the coroner's jury as follows: "I believe I saw some phials standing upon the washstand or table;" coroner Connery would not let me testify to anything but just what he pleased; he would only allow me to answer the questions he put to me; my testimony was read over to me after my exami-

nation; the coroner would not allow me to say anything, except what would convict Stephens; he prevented me several times from saying what I wanted to say; he several times told me to stop, and answer the questions he asked me; I requested the jury to allow me to state the circumstances, and they did.

*James Hannah*, called and sworn for the defence, testified, among other things, as follows: I am brother-in-law of the prisoner; the health of Mrs. Stephens was always bad after she had her baby; when she first came to this country, she always complained of a soreness of the chest and a swelling in her limbs, and also to a throwing off all the time occasionally; the first time I saw her throw off was fourteen years ago, and she was subject to it up to her death; I was to see Mrs. Stephens the Sunday previous to her death; I was there twice that day; I left at four o'clock, and did not see her again until she was dead; she then shook hands with me, and said: "God be with you, James;" I was also there every evening for the two weeks before that Sunday, except the previous Sunday, when I was there in the day time; I saw Fanny Bell give medicine to Mrs. Stephens; she told me it was medicine; I saw her give it to Mrs. Stephens out of a teacup; on Sunday morning I went there and the prisoner was asleep, and I saw Fanny mix a powder and give it to Mrs. Stephens; I saw her give Mrs. Stephens powders twice; after she took these medicines she vomited, perhaps half an hour afterwards; perhaps not more than twenty minutes; I did not see the prisoner give her any medicine; every time I went there, Mrs. Stephens threw up; I purchased arsenic at Dr. Cadmus' store in July, 1857; I got three cents' worth; I think I gave him a ten cent piece, and I did not count the coppers; I think I got it of a man named Flynn; Stephens went in and told him that he wanted it to poison rats, and Flynn helped him to arsenic; I put it in my pocket and paid for it; my wife was outside on the sidewalk; that night I mixed the arsenic with cold potatoes on a plate, and put it down the cellar; I afterwards got three cents' worth more from Flynn in August, 1857.

The witness being *cross-examined*, among other things, testi-fied as follows: I first heard of Mrs. Stephens' sickness in the afternoon of the first day that Dr. Cadmus visited her; I heard it from my wife; I went to the house a few days after Dr. Cad-mus made his second visit; I went every evening the last two weeks of her sickness up to the Sunday before her death; I cannot tell the day of the week I made my first visit; I saw the Bell girls there when I made my first visit; the prisoner was there; Mrs. Stephens was sitting in an arm-chair, and the child, Bella, was on her knee; the next time I saw the Bell girls there, and the sick woman with her child; I went to see Mrs. Stephens two Sundays, and I think I saw her twice on each Sunday; when I went in the evening, perhaps it might be seven o'clock when I went; I went over as soon as I took supper; I might stay there an hour or an hour and a half; sometimes an hour, and sometimes not; on Sunday I went be-tween eight and nine o'clock; usually stayed an hour or so; then I went home, or perhaps I went to church; I never saw Mrs. Stephens alive after four o'clock of the afternoon of the Sunday previous to her death; when I left she told me she was no better; the reason that I did not visit her the last two days was because I worked over-time then; I did not get home till between eight and nine o'clock in the evening, and I did not go over after that; I did not work any over-time during the two previous weeks; I work for Mr. Peckham, Twenty-third street, between the First and Second avenues.

*John Pullman,* sworn for defence:

*Q.* What was the conduct of these girls towards their aunt during her sickness, so far as you observed?

District Attorney asked that the witness be first interrogated as to what he knew about the matter.

Court—What opportunity had you of observing the con-duct of the two Misses Bell towards their aunt upon the occa-sion of her illness? *A.* The opportunities I possessed of no-ticing their conduct, was being in that place during her illness several times; I know I was there twice; I suppose I was in four or five times. *Q.* What was the conduct of the Misses

Bell towards their aunt? *A.* As far as I observed it, sir, it was unkind. *Q.* What was the conduct of Sophia Bell toward the defendant? *A.* How long do you want to cover with that question? As long as you please.

District Attorney objected, that the question should be confined to the time of her sickness.

Court—The question must be confined to the period of the last illness of deceased.

Defendant's counsel took an exception.

*Q.* How often during, say two years prior to the death of Mrs. Stephens, up to the time the girls left the house, did you see Sophia Bell and Stephens together? *A.* Times without number, sir.

District Attorney objected that this question and answer covered two years before Mrs. Stephens' death.

Court—I allow the objection taken by the prosecuting officer to any inquiry as to the conduct of these girls at a period anterior to the last illness of the deceased.

Defendant's counsel took exception.

Question and answer stricken out by order of the court.

*Q.* From your observation, was Sophia Bell more anxious to see Mr. Stephens than Mr. Stephens to see Sophia Bell?

Mr. Shaffer objected. The question was ruled out, and the defendant's counsel then and there took exception to the above ruling.

The court said, that while he overruled the question in the present form, yet the defendant would have a right to go into that point as to the probabilities of the prisoner having been actuated by a certain passion towards one of these nieces, or as to the probability of her having been actuated by a similar passion for him.

*Q.* What was the conduct of Sophia Bell towards the defendant for two years antecedent to the death of his wife, and up to the time when Sophia Bell left the house?

Court—The proper question is: What acts or expressions of hers did you observe towards the prisoner?

*A*. I observed her very much going after him—I mean Sophia Bell—was in the habit of loitering about the church, watching Mr. Stephens in the lobbies and doorway.

*Q*. What was the general conduct of Sophia Bell in respect to Stephens? Was it of a modest, retiring girl, or a bold, forward, impudent one?

Objected to. Excluded. Exception taken by defendant's counsel.

The witness being *cross-examined*, further testified, among other things, as follows: I knew of the prisoner's getting up and going out of church to see Sophia Bell as many as thirty times within the two years previous to the death of Mrs. Stephens; I do not know how long he stayed out; I do not know what times of the day they were.

Subsequently, and before the defence closed their case, the District Attorney directed the witness, John Pullman to be called, and he answered to his name, and the District Attorney then offered that every question which had been propounded by the defence to John Pullman, but which had been excluded by the court, might now be put to the witness and answered by him.

To this offer the counsel for the defence made no response.

*Richard Stephens* was called as a witness for the defence, and sworn, examined and cross-examined, but was not interrogated in relation to an alleged conversation with Michael Flynn in relation to the sale of arsenic to Stephens.

*John Stephenson*, called and sworn for the defence, testified, among other things, as follows: I attend the Twenty-seventh street Methodist Church; the prisoner was in my employ since 1849, up to the time of his arrest; I know nothing against him, except latterly there appeared to be an undue intimacy between Sophia Bell and him; Stephens and Sophia Bell went in and out of the church together at irregular hours; it was also a common occurrence for her to come into the Sunday school and take a seat on the male side, in close proximity to Stephens; she was also a member of the choir of which I am

leader; I have seen certain signals or telegraphs pass between her and him in church.

The witness being *cross-examined* for the People, further testified, among other things, as follows: I have seen Stephens talk with Sophia Bell in Sunday school; he taught a class, and it interfered with his teaching; I am superintendent of the Sunday school, but I did not speak to him on the subject; when passing telegraphs or signals to Stephens, I saw smiles or contortions upon Sophia Bell's face; they were more than smiles; they were smirks; I mean by smirking, a sort of smile, and an arrangement of the features by which to produce signals.

*Dr. Finnell*, sworn for the defence: The witness having testified on his direct examination, in relation to the symptoms of arsenical poisoning, and being cross-examined by the counsel for the prosecution, the following question was put to him:

Are these symptoms of arsenical poisoning—Appearance of red spots before the eyes; dizziness and burning in the chest; feeling as if a ball of fire were moving up and down in the stomach, continuing to increase until death; complaint of the burning being from bottom of chest, and coming up to the throat; vomiting through the course of the sickness; vomiting with great pain after eating and drinking; color of the vomited matter first yellow, continuing so for some days, then of a dark green color, getting darker and darker till death; vomited matter containing red spots, and appearances of little pieces of flesh on side of basin; mucus in vomited matter; pain in pit of the stomach, increased by pressure; extreme thirst, and drinking all the while; drinking everything cold; countenance changing, becoming very anxious, languid, careworn and fatigued; eyes sunk, and piercing expression; eyes having a sharp look; she a great deal debilitated; weakness of the limbs; numbness of the hands; coldness of the legs and feet for a week before death; two or three days before death legs and feet were swollen and cold; clenching her hands, and feeling for something all the while; inability to use hands and arms;

whole side numb the night before death; two or three days before death not answering questions readily; convulsive movements of the arms; constantly throwing her arms about the bed, catching hold of things; her lips swollen; one week before death suppression of the urine, continuing until death, it being connected with pain; the discharge of fæces connected with great pain, and of a dark color, of a very offensive kind, with blood; cold perspiration on her hands; drowsiness in the last part of sickness; great stupor and lassitude immediately preceding death; about two hours before death giving a horrid scream, and sinking away in exhaustion; growing weaker the longer she was sick. Are these the symptoms of arsenical poisoning?

Objected to. Overruled. Exception taken by defendant's counsel.

*A.* Yes.

Defendant's counsel offered in evidence the whole of the papers taken before Justice Welch, in the case of the People, on complaint of Fanny Bell, against James Stephens, for the offence of poisoning his wife, and the binding over, which contained all the affidavits, and all the other papers taken before the police justices.

The counsel for the defence did not state the object or purpose for which they offered the said papers in evidence, nor specify any particular parts that they proposed to read, nor had the attention of the parties making the depositions before the justice, been called to them on the trial.

Objected to by the prosecution.

Court—I exclude them on the ground that, being objected to, they are not strictly legal evidence.

To which ruling of the court the defendant did then and there except.

Defendant's counsel also offered all the papers which were before the coroner's inquest, now in court.

Court—Such part or parts as the attention of witnesses has been called to, in their examination on this trial, may be read by the defence, and the rest is rejected.

To which ruling of the court the defendant's counsel excepted.

Defendant's counsel now offered to read from the evidence of Doctor Doremus, Doctor Wood, and the two Bell girls, such portions as they deemed fit, without specifying what portions they so deemed fit.

Objected to by the prosecution.    Objection sustained.

To which ruling of the court the defendant excepted.

Defendant's counsel now offered to read as evidence to this jury the affidavits made by Fanny Bell and Sophia Bell, which were made for the arrest of Stephens, and which were used before Justice Welsh, the signature of the ladies being admitted genuine by counsel for the prosecution.

Objected to by the prosecution.

Court—Was their attention called to them?

Defendant's counsel—No.

Counsel for the prosecution said that the defendant's counsel asked the witness Sophia Bell whether she had not stated in her affidavit that Stephens administered a powder, and she replied that she had, and that she believed it to be true.

The Court—I will allow any portion to which the attention of any witness has been called, but I reject all the rest.

To which ruling of the court defendant's counsel excepted.

The defence here rested.

*William Knox,* called and sworn in rebuttal by the People :

Defendant's counsel objected to the examination of this witness, as they had called upon the prosecution to call him before they closed their case, and they then neglected to do so.    Objection overruled, and exception taken by defendant's counsel.

The witness testified, among other things, as follows:

*Q.* Do you know Sophia and Fanny Bell ? *A.* Yes.    *Q.* Are you related in any way to the Misses Bell ? *A.* Yes, they are my cousins.    *Q.* Did you ever sleep in the same bedroom with either of these two ladies ? *A.* Yes.    *Q.* Were you ever in or upon the bed with Miss Sophia Bell or Fanny Bell, or both of them, or either of them, at any time ? *A.* I was upon the bed with both of them.    *Q* How many times were you on the bed with

both of them? *A.* Once. *Q.* About when was it? *A.* I cannot remember the date. *Q.* Was it before or after Mrs. Stephens' death? *A.* After Mrs. Stephens' death. *Q.* Upon what occasion? *A.* I went up there on a visit. *Q.* Tell us what took place. *A.* I was going to bed to sleep with the prisoner, Mr. Stephens, and he told me to go and sleep with the girls?. *Q.* Did he say why? *A.* He said there was more room. *Q.* Tell us what took place. *A.* I went in; I lay down upon the outside of the bed; the girls objected, and said I should not do it, and I said I should do it; I laid across the foot of the bed. *Q.* What part of the clothing that you had on when you went to that house was removed during the time you were on the bed? *A.* My coat and hat, and no other part. *Q.* Did you remove your boots and shoes? *A.* No. *Q.* Were you at any time ever inside of a bed with Sophia Bell and Fanny Bell, or either of them? *A.* No.

The witness further testified as follows: I never got out of the bed where the prisoner was, and got into a bed with Fanny and Sophia Bell, or either of them; I remember hearing at one time, when I got up in the morning, that Isabella Bennett was under the bed in which the prisoner and I slept; I slept with him all the night, and did not get out of the bed at any time; Maria Hannah never came to the prisoner's house on a Sunday morning, or at any other time, and found me in bed with Fanny Bell or Sophia Bell, or either of them.

*Mrs. Jane Harvey*, called and sworn on part of the People in rebuttal.

Defendant's counsel asked what the prosecution desired to prove.

The prosecution replied that they proposed to show that no provisions were kept in the cellar of Clark's house, by Mrs. Hannah, as stated by her, Isabella and Maria Hannah.

Exception taken upon the ground that Mrs. Hannah, Isabella and Maria Hannah had been examined by the prosecution on this point; the defence asking no questions whatever in relation to these matters; and that the matter being collateral, and the prosecution having made these witnesses their own

upon these matters, they cannot seek to impeach them afterwards on these points by other withesses.

Objection overruled.    Exception taken by defendant's counsel.

In 1857 I resided in Twenty-third street and Avenue A, in the house of John Clark; I moved there the 1st of May, 1857; I remained in that house until the first of October; the family of the Hannahs were in that house when I was there; they were on the top of the house, on the same floor with myself, the fourth story; I did not know Mrs. Stephens, the deceased, intimately; I was introduced to her by Mrs. Hannah; I saw her there twice; I saw her there last about three or four weeks before her death; I was conversing with Mrs. Hannah at the time; what about I cannot say; I lived in that house from the 1st of May, 1857, to the 1st of October, 1857; I know of no provisions being kept in the cellar, and of no arsenic being there; I never heard anything about it; I have been there; it was fit for no person to go into, for the water was there and came into it, and you could not keep your wood and coal there, for it would keep it wet all the while.

*Q.* Do you know what quantity of provisions the Hannah family had at any time on these premises, while you lived there?

Objected to.    Objection overruled, and exception taken by defendant's counsel.

*A.* I never knew them having anything in the cellar.

*Q.* State all you know upon the subject.

Objected to.    Question allowed.    Exception taken by defendant.

*A.* One thing I will say, that they were in the habit of borrowing almost every little thing that I could mention; I never saw them bring provisions in any quantity at all; a large quantity was a quarter of a pound of butter.    *Q.* Where did they get their provisions?    *A.* I cannot say where they bought their provisions; they got many things from myself.

No cross-examination.

*Michael Thornton*, sworn, examined by the District Attorney on the part of the People, rebutting:

*Q.* Do you remember the coroner's inquest upon the body of Sophia Stephens in the fall of the year 1858? *A.* Yes. *Q.* Were you present? *A.* Yes. *Q.* In what capacity were you present?

Objected to by defendant's counsel as immaterial. Objection overruled. Exception taken by defendant's counsel.

*A.* As a deputy or clerk to the coroner. *Q.* What did you as such clerk or deputy at that inquest? *A.* I took down the testimony of each witness. *Q.* What paper do you now hold in your hands? *A.* The testimony of the different witnesses that was taken down before the coroner. *Q.* Look at page 24, and state whether you were present when that signature was written?

Objected to by defendant's counsel as immaterial. Objection overruled, and exception taken by defendant's counsel.

*A.* Yes. *Q.* Whose signature is it? *A.* Susan Hannah's. *Q.* In whose handwriting is the deposition on pages 22, 23 and 24, to which that signature is attached? *A.* In my handwriting. *Q.* Look at page 33, and state whether you were present when the signature on that page was written? *A.* Yes. *Q.* Whose signature is that? *A.* That also is the signature of Susan Hannah. *Q.* In whose handwriting is the deposition on pages 32 and 33, to which that signature is attached? *A.* Mine. *Q.* Look at these two depositions, and state whether or not, at the coroner's inquest, Susan Hannah testified as follows: "When I went there, I used to go occasionally into the sick room."

Objected to on the ground of impropriety. Objection overruled, and exception taken by defendant's counsel.

*A.* Yes. *Q.* And is it written so there?

Objected to on the ground of illegality. Objection overruled, and exception taken by defendant's counsel.

*A.* Yes. *Q.* Did she further testify that Mrs. Stephens' nieces were always in the sick room?

Objected to as illegal, leading and improper. Objection overruled, and exception taken by defendant's counsel.

*A.* Yes.   *Q.* Was her testimony in that respect taken down correctly?

Defendant's counsel objected to the witness reading from the paper when he was testifying, after he had refreshed his memory; and, secondly, that he had already answered the question.

Objection overruled, and defendant's counsel then and there excepted.

*A.* The evidence as given by different witnesses whose signatures are here, was taken down by me, and I can swear most positively to its correctness; I have not testified to the evidence taken before the coroner, from recollection.   *Q.* Do you mean to say that all the evidence taken down in that paper, in your handwriting, was taken down by you from the witnesses as they gave it?

Objected to.   Objection overruled, and exception taken by defendant's counsel.

*A.* Yes; all the evidence taken before the coroner from the different witnesses, was read by me, by the coroner's orders, to each of them, and they were requested by him to expunge everything that was incorrect, and to add anything that they desired, before signing their names; and each of them afterwards attached his or her signature.   *Q.* Did Susan Hannah further testify that Fanny Bell was the principal attendant upon Mrs. Stephens?

Objected to as leading.   Objection overruled, and exception taken by defendant's counsel.

*A.* Yes.   *Q.* Did she further testify in these words: "She expressed a desire to take no more medicines?" *A.* Yes, sir. *Q.* Did she further testify as follows: "I did not go so close to her as to find out whether it was laudanum or not?" *A.* Yes, sir.   *Q.* Did she further testify that Mrs. Stephens died about half-past two o'clock in the morning? *A.* Yes, sir.   *Q.* Was Mrs. Susan Hannah left to swear as she wanted to before the coroner's jury? *A.* I always understood the coroner to be most anxious to sift everything as far as possible.   *Q.* Was she left to swear before the coroner's jury as she wanted? *A*

Stephens *v.* The People.

I do not recollect her being prevented. *Q.* Tell all you know about the fact of her being allowed to testify as she wanted. *A.* I do not recollect of her being prevented in any way. *Q.* At the close of the examination, did the coroner say anything to them, and if so, what?

Objected to by defendant's counsel as immaterial; whereupon the court put the following question:

What was done in this particular case? Were these notes of yours read over to the witness before she signed them? *A.* Yes, sir.

*Q.* After you read the depositions over to the witnesses, did the coroner make any request to them before they signed their names, and if so, what? *A.* The coroner requested them, if there was anything objectionable, to expunge it, and to add anything further that they wanted, before signing. *Q.* Did she further testify as follows: "I was in the house the day before Mrs. Stephens died, until about six o'clock in the evening?" *A.* Yes, sir. *Q.* Did she further testify as follows: "I returned at eight o'clock, and remained until she died?" *A.* Yes, sir. *Q.* Did she further testify as follows: "I gave her drinks, lager beer, ice water," &c. ? *A.* Yes, sir. *Q.* Did she further testify as follows: "My brother gave nothing to Mrs. Stephens the day before she died, but milk and water?" *A.* Yes. *Q.* Did she further testify as follows: "All the matter vomited by Mrs. Stephens was yellow, green and other colors?" *A.* She said that what she vomited at the time was yellow, green and other colors. *Q.* Turn to page 36, and state whether or not you saw the signature on that page written. *A.* Yes, sir. *Q.* Whose signature is it? *A.* Isabella Hannah's. *Q.* In whose handwriting is the deposition on pages 34, 35 and 36, to which that signature is attached? *A.* It is mine, excepting a few lines in the handwriting of the coroner. The words on page 35, "Isabella Hannah being duly sworn, says," are in the coroner's handwriting. *Q.* In whose handwriting is the remainder of page 35? *A.* Mine. *Q.* In whose handwriting is so much of her deposition as is in page 36? *A.* It is in the handwriting of the coroner, except a few words of mine at the con-

clusion. *Q.* Will you be careful to answer only when the matter is in your handwriting? Tell me from that part whether Isabella Hannah testified on the subject of scouring the floor, after Mrs. Stephens' death? *A.* She says, in this deposition, I never washed the matting on the floor. *Q.* Did she further testify as follows: "I was in and out of the house while Mrs. Stephens was sick? *A.* Yes, sir. *Q.* Did she further testify as follows: "My mother gave my aunt a drink?" *A.* Yes. *Q.* Did she further testify as follows: "I saw my uncle give my aunt a drink?" *A.* Yes. *Q.* Did she further testify as follows: "My aunt used to throw up a few minutes after drinking?" *A.* Yes. *Q.* Turn to page 41, and state whether or not you saw the signature on that page written. *A.* Yes. *Q.* Whose signature is it? *A.* Maria Hannah's. *Q.* In whose handwriting is the deposition on pages 39, 40 and 41, to which that signature is attached? *A.* Mine. *Q.* Did she testify as follows: "For three weeks previous to Mrs. Stephens' death, I called there every other day?" *A.* Yes. *Q.* Did she further testify as follows: "She departed at about ten minutes past two the following morning?" *A.* Yes. *Q.* Did she further testify as follows: "I did not see her get any medicine or drink during this time?" *A.* Yes. *Q.* Did she further testify as follows: "I saw my mother wet Mrs. Stephens' lips once with water; I did not see anybody else apply anything to her lips?" *A.* Yes. *Q.* Did she further testify as follows: "Half an hour previous to my aunt's death, my uncle threw himself upon the bed in the next room?" *A.* Yes. *Q.* Turn to page 45, and state whether or not you saw the signature on that page written. *A.* Yes. *Q.* Whose signature is it? *A.* George Davis'. *Q.* In whose handwriting is the deposition on pages 42, 43, 44 and 45, to which that signature is attached? *A.* Mine. *Q.* Did he testify as follows: "I believe I saw some phials standing upon the washstand or table?" *A.* Yes.

So much of the depositions as were testified to and proven by the witnesses, were then put in evidence.

*Thomas Henry Jones*, called and sworn on part of the People. Rebuttal.

I reside at 182 East Twenty-third street, and am foreman of the marble mill of William Peckham; I know James Hannah; he works at that marble mill, and did so in September, 1857.

*Q.* In the book which you now hold in your hand, do you keep an account of the time of the men who work in that mill? *A.* Yes. *Q.* Tell me how much James Hannah worked there upon each day of the week ending the 19th day of September, 1857. *A.* He worked on Monday, one day; on Tuesday, one day and a quarter; Wednesday, one day and a quarter; Thursday, one day and a quarter; Friday, one day and a quarter; Saturday, one day. *Q.* How much did he work there upon the following days of the week, ending September 26th?

Defendant's counsel objected to the witness testifying from the book, as he should do so independently of it. Objection overruled and exception taken. Whereupon the District Attorney put the following question:

*Q.* Did you keep that book at the time? *A.* Yes, sir. *Q.* Did you make your entries correctly? *A.* Yes, sir. *Q.* Tell me, on the Monday of the following week how much he worked. *A.* One day and a quarter. *Q.* How much did he work on Tuesday? *A.* One day.

*Henry Maxwell,* called and sworn on the part of the People. Rebuttal: I reside at 125 East Thirty-first street, between the Second and Third avenues; I was a house agent up to July, 1858, and for some time previous; I had been attending the Methodist church in Twenty-seventh street during the pastorate of Drs. Floy, Currey, Wheaton, and the present pastor; for some weeks previous to July, 1858, I was acquainted with Miss Sophia and Fanny Bell; I was a local minister, and attended during the absence of the pastor, and also prayer and class meetings; I have met these ladies in class; I have had them under my eye, when I occupied the pulpit, on many occasions, and I never saw any impropriety in their conduct, and they held a respectable place in my estimation.

*Q.* Do you know whether either of them were connected with the Sabbath school while there? *A.* I do not know; I have not met them in Sabbath school.

*Cross-examination:* I have never been turned out of the church; I never had a charge preferred against me; Mr. Brewer never brought a charge against me for defrauding him; I am not now a member; believe it will be two years next fall since I left it.

Defendant's counsel asked to have the entire testimony of this witness stricken out, on the ground of immateriality Motion denied, and exception taken by defendant's counsel.

*John Bisco,* called and sworn upon the part of the People, testified, that he was one of the coroner's jury, and that no witness was prevented from telling all he knew on the subject.

*Charles Mulholland,* called and sworn on the part of the People. Rebuttal: I reside at 380 Fourth avenue, and am a tailor; I am connected with the Twenty-seventh street Methodist Church, and have been a member about three years.

*Q.* Are you acquainted with Miss Sophia and Fanny Bell? *A.* By meeting them in class. *Q.* With which have you met? *A.* I believe Sophia, the elder sister; it was Dr. Moura's class; I met them there Sunday afternoon, about two o'clock; I cannot state as to the time when it closed, because it was closed by the time of the afternoon service; the class was held in a little room as you went into the church, at the right hand side; when we came out, the Sabbath school generally met us; I do not know Mr. Stephens. *Q.* This man? (pointing to the prisoner.) *A.* Yes, I have seen him there. *Q.* Do you know whether he had any situation at any time connected with the Sunday school? *A.* Yes; I have seen him at the door where the preaching was held, in the audience room or lecture room where the Sabbath school was held. *Q.* I wish to know now, during the time you have known the Misses Bell, whether you have observed any improper conduct in and about the church between them and the prisoner, James Stephens? *A.* I never have.

Prisoner's counsel requested the court to strike out this testimony as irrelevant, and so instruct the jury.

The court refused, and defendant excepted to the ruling of the judge.

*Miss Fanny Bell*, recalled by the People in rebuttal.

*Q.* Did you at any time give Mrs. Stephens' any medicine? *A.* No, sir. *Q.* Were you at any time during Sophia Stephens' sickness, sick in any degree from eating cabbage and beef, or any other article of food, except the rice mentioned by vou on vour previous direct examination? *A* No, sir; I never called Mrs. Stephens a liar; I never attempted to strike Mrs. Stephens with a bench, or anything else; I never threw a bench at her; during the last sickness of Mrs. Stephens, Mrs. Hannah came there about two days, until the last day, when she remained there about an hour; Isabella Hannah, now Isabella Bennett, was there about two days the first week my aunt was sick; she returned home, and I did not see her but three times until my aunt's death; it was sometime during the last two weeks, until about Saturday; she was not there until Saturday; the morning that my aunt died, Mrs. Hannah and I went over and woke her up out of bed, and told her that she was dead; during the last day of Mrs. Stephens' sickness, Isabella Hannah came into the house; during Mrs. Stephens' last illness, Maria Hannah was there; she stopped in some three or four times, perhaps a quarter or half an hour each time; I could not name every day when she was sick that she was there; she came about eight o'clock the evening before she died; she was not there during the first part of that day; when she came at eight o'clock, she remained until the next morning about four o'clock; Mrs. Hannah's husband was there two or three times; he was there in the evening generally; he came twice for Mrs. Hannah; once he came alone when she was not there; he came some time before the last Friday before she died; my aunt had not, to my knowledge, any swollen limbs prior to her last sickness; I had not known of her being troubled with vomiting prior to her last illness; I never saw her vomit until she got sick; I do not remember making,

during Mrs. Stephens' last sickness, any article called flummery; I know. William Knox; he never got into bed with my sister Sophia and myself, nor with me at any time whatever, nor did he ever sleep on the outside of a bed in which we or I were, except on the single occasion I testified to on my former direct examination; he did not get into bed with Sophia and me the night Isabella Bennett was under the prisoner's bed, nor did Sophia leave me at any time that night; Isabella Bennett never saw him come to bed with Sophia and me, or with me, nor did Maria Hannah, on a Sunday morning, or at any other time, find William Knox and me sleeping together.

*Mrs. Mulholland*, sworn by People, in rebuttal.

*Q.* I will ask you whether, as between the Misses Bell and Mr. Stephens, you ever saw any conduct that attracted your attention as improper? *A.* Never, at any time.

*Elizabeth Kirk*, sworn by People, in rebuttal: I reside at 101 East Twenty-second street; during the summer of 1857 I resided in Twenty-third street, corner of Avenue A, in Mr. Clark's house; I know Mrs. Susan Hannah, Isabella, Maria and James Hannah; they lived in the same house, up stairs, on the top floor; the fifth floor I think it is; I lived there four years; I left it in May, 1858; there was no other person by the name of Kirk lived in the house when I did; when I left that house I moved into Twenty-third street, corner of Second avenue; I left the city last fall; was gone about six weeks; I have been living in the city ever since; I do not know that I ever heard of rats being in the cellar; the cellar was not fit to be used for anything; it was always wet and slushy.

*Q.* While the Hannahs lived there, please inform me whether they or you kept food in the cellar—meat, butter, cheese? *A.* I guess there was not any food kept there by any one; I know I never kept any, not even coals; it was not in a fit condition to get into it; it was wet; I know Isabella Hannah, now Isabella Bennett; I recollect the occasion of Mrs. Stephens' funeral, because I lent some things to be worn.

*Sophia Bell*, recalled for the prosecution, among other things, testified as follows: William Knox was never in bed with me, or with my sister and me, at any time; nor did he ever sleep in the same room with me, or with my sister and me, except the one time to which I testified upon my former examination; I never was in bed with the prisoner, neither at any time when Isabella Bennet was under it, nor at any other time; Maria Hannah did not find me asleep in a rocking chair at a time when William Knox was in bed with my sister Fanny; I never knew them to be in bed together, and I do not believe they ever were.

The prosecution here closed their rebutting evidence.

*James H. Welsh*, called and sworn for the defence, testified as follows: I am one of the police justices. (The testimony of William Knox before the justice, on the preliminary examination of the prisoner, was here shown to him.) My name, subscribed to the jurat, was written by me, and the witness was sworn by me; his testimony was reduced to writing by my clerk; I do not know whether it is correct or not.

The counsel for the defence then offered in evidence all the papers on the preliminary examination of the prisoner before Justice Welsh, including the affidavits of Fanny and Sophia Bell, on which the prisoner was arrested; to which was annexed the original anonymous letter hereinbefore set forth, and also the testimony of the witnesses, Dr. Francis W. Iremonger and William Knox.

The counsel for the prosecution objected.

The court overruled the objection, and admitted the papers in evidence.

The counsel for the defence had *Richard Stephens* called as a witness, who did not answer.

The counsel for the defence then stated that they had no other witness, and the court announced that the case was closed for the prosecution and for the defence, and directed the summing up to proceed.

The counsel on both sides then requested the court to adjourn until the following day to enable them, as they stated,

to prepare to sum up, which the court, it being then only about eleven o'clock, A. M., declined to do. The counsel then mutually agreed that two should speak on each side, the defence opening, and the counsel then alternating, and the court assented thereto. After the motion to postpone had been made · and denied as above, and after the arrangement to summing up had been made and announced to the court, the defendant's counsel, upon affidavit, moved to have an attachment issued against Richard Stephens, the same witness already examined on the part of the defence.

The court at that stage of the trial, and after what had transpired, refused on such affidavit to grant an attachment, to which refusal the defendant's counsel excepted.

The case was on the two following days summed up by the counsel for the defence and for the prosecution, and the court thereupon charged the jury as follows:

### THE JUDGE'S CHARGE.

After a protracted trial, gentlemen, of nearly three weeks' duration, involving, in the main, a mere question of fact, and after so many hours spent by counsel in a minute and elaborate dissection of the evidence, I do not deem it proper, as it certainly is not necessary, that the court should still further task your patience by any extended remarks. I shall confine myself, therefore, to a very brief outline.

The prisoner is charged with the crime of murder, committed, it is alleged, about a year and a half ago, in September, 1857, on the person of his own wife—not by violence, or in an outburst of angry passion, but by the slow, stealthy and deliberate administration, under color of food or medicine, of repeated doses (I take no notice of the laudanum), of one of the most virulent poisons known in nature. I need not say to you, gentlemen, that such a charge, involving turpitude and cruelty almost surpassing belief, should be supported either by the clearest direct and positive proof, or by a mass of circumstantial evidence, all tending to one result, and so consistent in its leading features as to leave no reasonable room for doubt.

Whether the evidence in the present case, taken as a whole, comes up to the required standard, it will be for you to determine. The court may aid, but cannot supersede your functions. The issues of life and death are, by law, in your hands, and yours exclusively. In analyzing evidence, gentlemen, especially where it is merely or mainly circumstantial, I have always found a great advantage in keeping steadily in view the two particulars of time and place. Chronology and geography, it has been well said, are the eyes of history. To begin, then, with the first date and place of any importance in this transaction: In the year 1848 or 1849, or about that period—the precise year is not material—there was a respectable family of the name of Bell, living in one of the interior northern counties of Ireland, settled mostly—I mention the circumstance as accounting for one of the features of the case—by persons of Scotch and English extraction. It consisted of the father, a maiden sister of about 36 years of age, two daughters, one about 16, the other about 11, a younger son, and it may be some other children. Into this family the defendant, then a young man of only two or three and twenty, and possessing, as we have a right to infer from the evidence, an unexceptionable character, was introduced as a suitor. Why he selected the aunt of 36 in preference to the niece of 16 is unexplained. All we know is that he did so—that his choice was ratified by its object, and that the wedding, or at least its essential preliminaries, took place under the brother's roof, and seemingly, and I think I may say actually, with the brother's approbation. Instead of the usual bridal tour—usual at least among Americans—the happy couple—for nothing is shown to indicate that they were not then happy—emigrated from the county of Cavan, a not very unusual occurrence, to the city of New York. Here we find them comfortably, and we may infer happily, established, occupying, although not very spacious, the entire of the third floor of the brick house known as 166 East Twenty-seventh street, divided into a sitting room, hall, two bedrooms and a kitchen—the dimensions of the whole being about 23 feet square. And here, in an evil

hour—evil for both parties, as its consequences, in any view of them, most painfully demonstrate—they invited the eldest of their absent nieces to pay them a visit. She had then become an attractive young woman of eighteen. With her father's concurrence, and accompanied by two friends, she undertook the voyage, arriving in New York the day after her aunt had given birth to an infant daughter, and of course, in the midst of the joy which such an event was calculated to impart to both the parents, her reception, we may presume from the known attributes of the Irish character, was cordial and affectionate. One of the only two bedrooms at their command was assigned for her use; and, with commendable delicacy, that room was selected which alone opened upon the hall, and had no direct communication with the other, or with the parlor. Here she remained for a considerable time, learning—she went daily to the establishment for that purpose—the trade of a dressmaker. Having at length attained sufficient skill in the use of the needle, she procured a situation as dressmaker in a private family living on the Fifth avenue, not very far distant from her aunt's residence. On one occasion, while residing at that place—she continued, it will be remembered, to reside there about three years—Stephens, while the family were out of town for the summer, paid her a visit, bringing a bottle of wine with him. To gratify his curiosity, she took her uncle through the establishment, showing him the splendid furniture, and pointing out to him, among the other chambers, her own comfortable apartment. While so engaged, her uncle, she says, seized her and attempted an act of violence to her person, the consummation of which her threatened screams alone prevented. Is this statement true? No eye saw the act except her own and the prisoner's. Her subsequent silence on the subject of the alleged outrage has afforded matter of severe criticism. It is for you to judge of her explanation. She says the prisoner expressed great regret for the hasty indignity, and threatened, if she disclosed it, to separate from her aunt and break up the family. His penitence and his threats combined—although not quite reconcilable with each other—

sealed her lips. But why, only six months after, did she return, even with the safeguard of her aunt's presence, to sleep under the roof of the man, although her uncle, who had so lately demonstrated his unfitness to be trusted? The first exceptionable occurrence, it will be remembered, if the testimony is to be relied on, took place about the month of September, 1856.

Shortly afterwards the youngest sister, then still in Ireland, being in bad health, was recommended, it seems, to take a sea voyage. A correspondence accordingly ensued, and the invalid was invited by her uncle and aunt, to make them a visit, to return, after a year's absence, to her native home. She (that is, Fanny Bell, the younger sister), arrived here, a girl of eighteen, in March or April, 1857, about six months after the occurrence alluded to, and about six months before her aunt's death. She (I mean Fanny Bell) went immediately to her aunt's house. It was natural that her sister there should join her, or be there to receive her. They could be company for each other, and (a consideration which, with their probably very limited means, was not to be disregarded), they could, as two sisters well might, occupy the same room and the same bed. Their father, too, little imagining such a scene as this trial presents, and having an entire confidence, it would seem, in the defendant's prudence and integrity, had instructed them to be guided in all things by their uncle's advice. Under the same roof also was their infant cousin, their aunt's bright and petted only child. The prisoner himself has demonstrated in the face of the court and jury the existence and probable force of that attraction. Whether these circumstances are sufficient or not to account satisfactorily for Sophia Bell's return to her uncle's house, notwithstanding the alleged outrage, it will be for you to determine. Assuming, for the present, that this first offence was attempted, was regretted and was forgiven—all of which you are to judge of—we may pass on to the next incident of importance which the testimony discloses. You will bear in mind that both sisters, although they went out to work as dressmakers, were now, in the spring of 1857, living with

their aunt, contributing, as we may presume, one or both of them, to the expenses of the house during the six months (an important era) immediately preceding her death. Toward the close of that period, in the month of August, an altercation, it is alleged (it is the next incident in order), took place in the parlor between Stephens and his wife, about the funeral of a friend. Stephens dressed himself to attend it. His wife wished to accompany him. He refused to wait for her. Words passed, and he, it is said, struck her a blow in the eye, upon which she exclaimed that he was a murderer, or that he was murdering her. The door of the room, at the time, was not quite closed, and both the sisters were standing outside. On hearing the noise and the blow they entered, and saw their aunt with a handkerchief held to her eye. She wished them not to speak of what had taken place.

Such is their version of the second material incident bearing on the question of motive. The prisoner's counsel contend that the whole is a mere fiction, and, undoubtedly, there is some strong testimony which it is difficult to reconcile with the absolute truth of the statement. The existence of the black eye was subsequently perceived, it is true, by other witnesses, but others again did not observe it. The probabilities of the case may be, that a blow was given, but that its results were not so visible as to be noticed by a casual observer. In this way, only, if at all, can the testimony be reconciled. It may be proper here to add, as an established rule of evidence, that where testimony, seemingly conflicting, can be reconciled, perjury is not to be presumed.            :

In addition to the outrage referred to, one of the sisters swears that about the same period, although I do not understand her to speak of the same occasion, she heard the prisoner say he wished her aunt dead, or out of the way. Indeed, according to the accounts of both the sisters, contradicted strongly by other witnesses, he made no secret at this time of his unkind feelings toward her, treating her with much roughness and disrespect, both in word and manner, while he evinced, as some of his later expressions would seem to prove, a marked

Stephens *v.* The People.

partiality toward one of the nieces. He dwelt particularly, they say, upon the unfortunate disparity in the ages of himself and wife, she being about forty-six, while he was only thirty-two. When he accompanied her, which, however, he often refused to do, it was a source of annoyance to him that the world should say she looked old enough to be his mother. On the other hand, however, the prisoner has shown by numerous witnesses, that the kindest relations subsisted between himself and his wife, and that in her dying moments she addressed him in terms of tenderness and endearment. But assuming, on this point, all the evidence on the part of the prosecution in its main outlines to be true, it is far from sufficient, by itself, to make out a case of contemplated murder. Spleen, and disappointment, and jealousy, and ill-humor, may exist without the remotest approach to a murderous intent. Even a blow in the face, if with the hand merely, scandalous and unmanly as it may be on the part of the perpetrator, where a woman is the object, and especially if that woman be a wife, is no evidence, or, if any, very slight, of a design to kill.

There occurred, however, simultaneously, or about simultaneously with this transaction, the most important incident which the testimony has disclosed. Mr. Flynn, a druggist residing in the Second avenue, within a very short distance of the prisoner's home, whose place the prisoner had for several years been in the habit of visiting, swears that about six weeks before Mrs. Stephens died, he sold her husband a parcel, consisting of half an ounce of white arsenic, and again, in the course of the ensuing week, another like quantity of the same material. A fact like this, if unexplained, would add terrible significancy to the previous outrage, if that outrage, as the prosecution contend, was actually perpetrated by the prisoner. You will, therefore, give to the evidence—somewhat contradictory as it seems to be—in relation to the alleged blow inflicted upon the deceased, the most careful consideration. Whether you find the blow to have been inflicted or not, or whether you find it to have been a comparatively slight or a more severe one, the inquiry will still have to be answered

(the contradicting testimony of James Hannah I shall presently consider), what induced the purchase and repeated purchase by the prisoner, at the time referred to, of so large a quantity, or any quantity of a known deadly poison, and to what purpose was it to be, and was it in fact applied? We find the wife of the prisoner, on or about the 6th of September, within a few weeks or days after the purchase, complaining, though very slightly, of a pain in her chest. Her husband, contrary to her wishes, sent for a physician. The physician, after two attendances, deeming the matter of little consequence, discontinued his visits, and at the end of a year and a half, so slight had been the impression made upon his mind, was unable to recollect the symptoms of his patient. In ten or eleven days, however, the case assumed a serious form, and another doctor was sent for. This was five days only, I think, before the patient's death. He found the patient suffering from pain in the pit of the stomach, and vomiting, and great debility. His visits, nevertheless, after three short attendances, of only a few minutes each, by direction of the prisoner, it is said, were discontinued, and in thirty-six to forty hours thereafter, his late patient was a corpse. Her death took place at about 2 o'clock, on the morning of the 23d September, 1857, being the 18th day from the commencement of her illness, if we count from the first visit of Dr. Cadmus, on the 6th of that month.

You have heard detailed by three or more witnesses, the burning thirst and other symptoms which exhibited themselves during that period, and especially on the Sunday, Monday and Tuesday, preceding its termination. You have also heard from the lips of some of the most distinguished members of the medical profession—all agreeing in the main features of their testimony—what are the effects exhibited before death where arsenic has been taken in poisonous quantities, and which of those effects are peculiar to that one cause. On these statements, weighing them deliberately, it will be for you to determine, as one of the steps to your ultimate conclusion, whether the symptoms in the case before you were, in point

of fact, the same substantially as those attendant on arsenious poisoning. Should the comparison, after the most careful study of every particular, still leave any doubt on the mind, you will then have the right, and it will then be your duty, to look to another, and perhaps the most wonderful feature in this most remarkable case. *Post-mortem* examinations, as generally understood, are dissections of the body made within a few hours, or, at furthest, days after the death. In the instance of Mrs. Stephens, a whole year had elapsed. She died on the 23d of September, 1857, and was exhumed on the 23d of September, 1858.

This long period of interment, so fatal in ordinary cases to both observation and experiment, has furnished, it is said, one of the strongest links in the chain of evidence to establish the fact that arsenious poison, howsoever and by whomsoever admininstered, was the true cause of the death in question. The body was in a state of preservation, to be accounted for, say the chemists, by the known action of arsenic, and yielded, under the operation of, probably, the most perfect and careful analysis ever conducted by scientific men, a sufficient quantity of the poison to demonstrate that arsenic had been taken into the system before death, and that death resulted from it.

I need not go over those admirable experiments which so wonderfully illustrate the powers of science, and do much honor to Dr. Doremus and his associates. They have been almost repeated by description in the course of the trial, and must be fresh in your recollection. It will be for you to consider them candidly, and to give them, as on a question of life and death, all the weight to which, in your deliberate judgment, making due allowance for possible error, they shall seem entitled. Should you come to the conclusion that these evidences, thus elicited from the dead body, taken in connection with the symptoms displayed in the living, established, beyond a reasonable doubt, that the deceased died of the effects of arsenic, your next inquiry will be (and it is not absolutely free from difficulty), by whom, and with what intent, was the poison administered. I shall not stop to consider a suggestion

slightly indicated in some of the statements of the defendants'
witnesses, that the blood nieces of the wife were the authors
of her death. No conceivable motive existed or has been
assigned for such an act on their part; and the implied charge
may be placed, I think, rather to the account of a spirit of
partizanship (of which there have been indications on both
sides) than to a spirit of candor. Dismissing that suggestion
—a suggestion rather calculated to injure than to advance the
cause of the prisoner—I shall now call your attention for a few
moments to the position on this point taken by the counsel for
the People. The prisoner's wife, you will recollect, was con-
fessedly fourteen years older than himself. Although fair and
robust, she had lost one of the great elements of female
beauty—her teeth, as is but too common an occurrence in this
climate, had been the victims of premature decay; and her
disposition, whatever it may have been originally—if the char-
acter given by the prisoner's sister is to be relied on—had, for
at least two years past, assumed a complaining type. Her
niece, on the other hand, who was in constant habits of inti-
macy with the prisoner's family, was young, and had just
attained the age of womanhood. That niece has been before
on the witness stand. You have had ocular evidence of her
personal appearance, whether attractive or otherwise, and of
the probable influence, if any, upon the mind of the prisoner.
In an unguarded moment—giving to the transaction its mild-
est construction—he showed its actual influence, if her testi-
mony is correct, in an unlawful attempt during his wife's life-
time, the particulars of which have been given, and need not
again be repeated. And in a month after his wife's death—
the barrier to a new union being removed—according to the
same testimony, he made formal and urgent proposals of mar-
riage, which, being rejected, were followed by a second unsuc-
cessful attempt upon her person, and at last, by a scandalous
anonymous letter, addressed to a rival suitor, to prevent the
consummation of a pending engagement, destructive of his
hopes. This letter you will probably regard as of great im-
portance in determining the state of the writer's mind at the

time it was conceived, and as reflecting back with much significancy upon an anterior period of his life, if written by the prisoner. Its authorship, therefore, becomes a matter to be carefully inquired into. On this point, you will recollect, one of the Misses Bell swears that she is acquainted with the prisoner's hand, and that the writing is his. In a civil suit this evidence, unless contradicted, would be sufficient to establish the fact. In a case of life and death, however, unless fortified by other circumstances, the mere evidence of such handwriting might well be distrusted. But we have the additional fact, testified to by Mr. Flynn, that the prisoner came to him with a letter inclosed in an envelope, requesting him to write the address; that he did so, and that the envelope produced by the witness, Cardwell, is the identical paper. Cardwell then testifies that the letter so addressed was handed to him by a boy, and that it is the same as now in court. Neither of these witnesses being impeached, their testimony, if believed, would seem, even without the aid of Miss Bell's, to fix the authorship upon the prisoner. What, then, does the writing of such a coarse, illiterate, anonymous production indicate? There can be, it would seem, but one answer—disappointed passion and thirst for revenge; and a striking confirmation, more or less complete, of the narrative of his conduct given by the Misses Bell. I have assumed thus far that the evidence given by Flynn, of the purchase by the prisoner of arsenic, on two occasions, shortly before his wife's illness, remains uncontradicted and unexplained. This assumption must now be modified, if not reversed. Mr. and Mrs. Hannah, the brother-in-law and sister of the prisoner, and I think their two daughters also, testify in effect that the poison was purchased for, and actually applied to, the ordinary purpose of destroying vermin; and that it was so used—not on the premises of the prisoner, but on those of his sister's family. This testimony, as you will remember, has been criticised with much severity. It, no doubt, requires to be closely scrutinized, but is not necessarily to be discredited. It presents the spectacle of a married sister, with all the members of her immediate family in her behalf,

struggling—and, if supported by a conscious sense of truth, justly struggling—to save a brother from an ignominious death. Such a case calls for much indulgence on the one hand, and for considerable drawbacks on the other. We have the highest authority for saying, "What will not a man give in exchange for his life?" And it will be for you, gentlemen, to say whether, in the present instance, life has or has not been sought to be purchased at the expense of truth. If you come to the conclusion that the poison testified by Mr. Flynn to have been sold to the prisoner on the two occasions referred to, shortly before the illness of the deceased, was in fact sold to Hannah (the prisoner being only present at the purchase), and that it was in fact applied by Hannah to the destruction of vermin, and not to the destruction of the prisoner's wife, then one of the main, though perhaps not essential proofs of the charge against him, will have been overthrown.

Still, however, the oft-repeated inquiry will remain, how came arsenic to be found (if it really was found), in the body of the deceased a year after its interment? If arsenic, as the men of science say, be not a constituent of the human frame, either before or after death, by what agency was it in this instance infused into every part of the system? The two physicians, Drs. Cadmus and Iremonger, who successively for a few days attended the deceased, swear, in effect, that there was no arsenic in their prescriptions. These, therefore, by whomsoever administered, unless we suppose some unexplained accident, could not have been the cause. As to the food and drinks—the latter so incessantly called for—they appear to have been given to the deceased by the prisoner and his sister and his nieces, indiscriminately. There was ample opportunity, if so disposed, to infuse arsenic into them by either, or by two or more of them combined. It is for you to weigh the respective probabilities. Why, it has been asked, did the prisoner, if desirous of preserving his wife's life, not send for a physician? Or, rather, why did he at the most critical moment direct—if such was the fact—a discontinuance of the medical visits? I confess to you, gentlemen, that with no little desire

to be charitable, I have found some difficulty in answering this question. It may have been that "his poverty, not his will, consented." But why not make at least an effort? When, with the terrible sufferings of his wife before him, the mother of his only child, sufferings sufficient to excite the sympathy of the coldest, and to prompt the most indolent to exertion, why did he not go—I had almost said rush—to the physician, and beg, if he could not buy him, to come to her relief? The act might have been ineffectual, but it would at least have been demonstrative of kindness and hope. Instead of that, the prisoner, through one of his witnesses, tells us that, yielding to his wife's entreaty, he retired to an adjoining room, went to bed, and did not return till the lapse of five or six hours, at the moment the sufferer was drawing her last breath before dissolution.

The prisoner at the time, gentlemen, it will be recollected, was not a giddy, thoughtless youth. He was a man thirty-two years of age—a father, a member of the church, a teacher in one of its Sunday schools. What, then, it may be asked, does such conduct, under such circumstances, indicate. Does it indicate merely apathy and indifference, or does it indicate, with other circumstances, a transfer of the husband's affections from his wife to another object? In this connection it must be observed that the defendant himself has proved, by his own witnesses, a very striking intimacy, both before and after the death, between himself and his wife's niece; an intimacy which, in an anonymous letter, he was willing to insinuate had reached, or nearly reached, the point of actual criminality. As it is your province, however, gentlemen (it being a criminal case), to determine the meaning of that letter, in the light of the surrounding circumstances, and to ascertain, with that aid, the inferences legitimately to be drawn from it, and as its bearing upon the question in issue is deemed to be of controlling importance, reflecting its shadows back upon the dark night of the 22d of September, I shall detain you a few moments by laying before you once more its literal contents. It was ad-

dressed, you will recollect—I mean the envelope—to Mr. Samuel Cardwell, the supposed suitor of the lady.

(The judge then read the letter in the hearing of the jury.)

If then, gentlemen, you find that the deceased died of the effects of arsenic, that the poison was not given to or taken by her through mistake or accident, that it was administered designedly by some person attending on her, that there is no reasonable ground for attributing the deed to any person other than the prisoner, you will still have to consider whether the case against him, calmly viewed in all its bearings, is so clear as to admit of an unhesitating verdict of conviction. Hesitation in capital cases, as you well know, is the property of the accused. A lurking, anxious impression of possible innocence, should such impression exist, is enough to stay the hand of criminal justice. It is better, says the law, that ten guilty should escape than one innocent suffer. By this, however, you will not understand me as expressing or implying an opinion on the offence with which he is charged, for or against the prisoner at the bar. That is your prerogative, as it is your painful duty, and to you I leave it.

Thereupon the counsel for the defendant excepted to each and every part and portion of the said charge, as being contrary to both the law and the fact.

Which exception the court refused to allow.

The counsel for the defendant requested the court to present the following propositions to the jury as part of its charge:

1. That the counsel for the prosecution having read to the medical witnesses certain symptoms from a paper marked by the judge, and inquired their opinion as to the cause of death in a case where such symptoms existed, if the jury believe that the symptoms of which Mrs. Stephens complained in her life time, are not in all respects the symptoms stated in the paper read to the physicians, that then the medical opinions are not admissible as competent evidence to be weighed by the jury, and cannot be taken into consideration.

2. That if the jury are of opinion that the body of Mrs. Stephens, after being exhumed for analysis, was so exposed that access could be had to it by other parties than those who made the *post-mortem* examination of the body and conducted the chemical analysis, and particularly if they believe that Robert Bell, one of the witnesses for the prosecution, who first charged the prisoner with poisoning his wife, actually had access to the body and touched it, an analysis made under such circumstances is not competent evidence against the prisoner, and should be disregarded by the jury.

3. That when a prisoner is charged with the commission of a crime, and evidence of good character is introduced by him, which is not controverted on the part of the People, such evidence is to be considered by the jury, and is not merely of value in doubtful cases, but will of itself sometimes create a doubt, where, without it, none could exist; and if good character be proved to the satisfaction of the jury, it should produce an acquittal, even in cases where the whole evidence slightly preponderates against the accused.

4. When a charge depends upon circumstantial evidence, it ought not only to be consistent with the prisoner's guilt, but inconsistent with any other rational conclusion.

5. That if the jury, upon considering the whole of the evidence, have a reasonable doubt of the guilt of the defendant of the offence charged in the indictment, it is their duty to acquit.

6. That if the jury believe that Robert Bell attempted to assassinate the prisoner before his arrest upon the charge of poisoning his wife, and that he entertained feelings of animosity and hatred towards him, and that if the jury believe that Sophia and Fanny Bell are also hostile towards the prisoner, and have quarrelled with him, that then they should consider these matters in weighing the degree of credit which is to be given to their testimony.

The court then charged affirmatively on each of the said propositions, as requested by the defence, except the second,

on which, modified so as to read as follows, the court also charged affirmatively:

That if the jury are of opinion that the body of Mrs. Stephens, after being exhumed for analysis, was so exposed that access could be had to it by other parties than those who made the *post-mortem* examination of the body, and conducted the chemical analysis, under such circumstances that they could have applied arsenic to it, and particularly if they believe that Robert Bell, one of the witnesses for the prosecution, who first charged the prisoner with poisoning his wife, actually had access to the body and tampered with it, so much of the analysis as was made after the body was so exposed and tampered with, is not competent evidence against the prisoner, and should be disregarded by the jury: to which refusal of the court to charge in favor of the second proposition as submitted, and to the charge of the court in favor of the second proposition as modified, the counsel for the prisoner excepted. The counsel for the defence then presented the following exceptions to the judge's charge:

1. The counsel for the defence excepted to the remark of the judge that a suggestion had been slightly indicated in some of the statements of the defendant's witnesses, that the blood nieces of the wife were the authors of her death, on the ground that the counsel for the prisoner had in his summing up to the jury expressly disclaimed such a position.

2. The counsel for the defence excepted to the reading by the judge of the anonymous letter as a part of his charge, and to the judge's comments thereon; and the judge thereupon said to the jury: " You, gentlemen of the jury, are the sole judges of the authorship of this letter, its transmission, the interpretation of its contents, the effect of it in this case, and of everything pertaining to it."

3. The counsel for the defence excepted to the remark of the judge, " What will not a man give in exchange for his life," in the connection in which it was used.

The court then further charged the jury that they alone were the judges of all questions of fact; that if the court had

expressed any opinion upon the evidence, or any part of it, the jury were still to determine for themselves what the evidence was, what weight was to be given to it, and what effect it should have in the cause, giving the prisoner the benefit of every reasonable doubt.

The following writ of *certiorari* was allowed and issued in this case:

The People of the State of New York, to the clerk of the Court of Oyer and Terminer of New York, *Greeting:*

Whereas, a writ of error was allowed by Daniel Pratt, one of the Justices of the Supreme Court, directed to the clerk of the Court of Oyer and Terminer, wherein James Stephens was plaintiff in error, and the People of the State of New York defendants in error, which writ was made returnable to this court on the seventeenth day of May, instant, and which writ was returned by the said clerk on the said last mentioned day, together with the record of the trial, and conviction of the said James Stephens of the felony of murder, and the judgment of the said court thereon; and whereas, it has been alleged by the affidavit of said James Stephens, that there is a diminution in the record and the matters returned by the said clerk of Oyer and Terminer, with the said writ of error, which it is suggested to the court here, are necessary to be returned, in order that it may correct and redress the errors which it is alleged have happened in the said Court of Oyer and Terminer, in the trial and proceedings in the case of the said James Stephens; and whereas, it is alleged that the diminution in the said record and proceedings consists in the omission to return the following matters and things, to wit:

*First*—The reasons filed in the said Court of Oyer and Terminer by the said James Stephens for a new trial and in arrest of judgment.

*Second*—The affidavits made and filed in said court on the twenty-ninth and thirty-first days of March, to wit: the affidavits of Edward Murray, Leonidas Abbott, James Ste-

phens, Nelson J. Waterbury, Robert Ogden Doremus and Abraham Gumpp.

*Third*—A certified copy of the minutes and docket entries kept by the clerk of the said Court of Oyer and Terminer, which contained the entries and proceedings which were had in the case of said James Stephens.

Now, we therefore command you, the said clerk of the Court of Oyer and Terminer of the county of New York, that you distinctly and plainly, under the seal of the Court of Oyer and Terminer aforesaid, and under your certificate as the clerk thereof, forthwith do send to a general term of the Supreme Court of the first judicial district of the State of New York, now being holden in the city of New York, all the matters and things hereinbefore specified and mentioned, and constituting, as it is alleged, the diminution of the record and proceedings had in the case of the said James Stephens, in the said Court of Oyer and Terminer, together with this writ thereto annexed, that we may further cause to be done in the said premises what of right ought to be done.

Witness, James J. Roosevelt, presiding justice of the said Supreme Court, sitting in the first judicial district, the 23d day of May, 1859.

[L. S.]                         JOHN CLANCY, *Clerk.*

The foregoing writ of *certiorari* is allowed according to its terms, but without prejudice to any questions, and we direct that the same be sealed and signed by the clerk of the Supreme Court.

By the Court,

J. J. ROOSEVELT, *P. J.*

To which a return was duly made of all the papers called for by such writ.

*S. B. Cushing* and *John W. Ashmead,* for the plaintiff in error

I. The question arises in this case, what is the record, and what will the court regard as such? It will be contended, on the part of the plaintiff in error, that the record is an authentic testimony in writing of the proceedings in an action at law, which is preserved in a court of record. In other words, it may be defined to be a written memorial made by a public officer, authorized by law to perform that function, and intended to serve as evidence of something *written, said* or *done.* Hence, every transaction which appears authoritatively to have taken place during the trial of the case, makes up the record. *Britton* (*ch.* 27), says: "That a record is an authentic testimony in writing, contained in rolls of parchment. In these are contained the judgment of the court in each case, and *all the proceedings previous,* carefully preserved." So *Blackstone* says (1 *Com.,* 69), the judgment itself, and *all* the proceedings *previous thereto,* are carefully registered and preserved under the name of *records,* in public repositories set apart for that particular purpose; and to them frequent recourse is had when any critical question arises. (18 *Viner's Ab.,* 176; *Jewell* v. *The Com.,* 10 *Harris R.,* 94; *Fisher* v. *Cockerell,* 5 *Pet. R.,* 253; *Read* v. *Marsh,* 13 *Pet. R.,* 153; *Sutliffe* v. *The State,* 18 *Ohio R.,* 469; *Com.* v. *Pfeifer,* 3 *Harris R.,* 489; *People* v. *Cancemi,* 7 *Abbott Pr. R.,* 299; 2 *R. S.,* 921.)

II. A challenge for principal cause forms part of the record, and also all affidavits filed below. None of the affidavits which were read in the Court of Oyer and Terminer, nor any of the challenges made in the present case, appear on the return to the writ of error, but have been brought up on the *certiorari.* The minutes or docket entries, are also a part of the record. *Ex parte Vermilyea,* 6 *Cow. R.,* 555; *Jewell* v. *The Com.,* 10 *Harris R.,* 94; *Sutliffe* v. *The State,* 18 *Ohio R.,* 469; *Com.* v. *Pfeifer,* 3 *Harris R.,* 489; *Beal* v. *Langstaff,* 2 *Wilson,* 371.)

III. The term of the Court of Oyer and Terminer, at which the defendant was tried, having ended, the record must stand as it is, and is not susceptible of amendment, the statute of Jeofails not extending to criminal cases. "During the *term* wherein any judicial act is done, the record remains in the

*breast of the judges of the court,* and in their remembrance, and therefore the roll is alterable, during that term, as the judges shall direct; but when that term is *past,* it admits of no *alteration,* averment or proof to the contrary." (*Co. Litt.,* 260, *a.; The King* v. *Selfe,* 8 *Mod. R.,* 45; *Bold's Case,* 1 *Salk. R.,* 53; *King* v. *Keat,* 1 *Salk. R.,* 48.)

IV. Whenever an amendment to a record in a criminal case is permitted, it is made from the minutes or docket of the clerk of the court, or the clerk of the assize, but there is no instance of the minutes or docket entries being corrected by what is subsequently made up and termed the record. (*Davenport* v. *Israel, Cumberback's R.,* 285; *Hill* v. *Prowse, Noy's R.,* 118; *Tidd's Prac.,* 931.)

V. The District Attorney has no authority, by law, to make up a record in any criminal case, except when requested by a *defendant;* and he can only furnish the clerk of the court in which the defendant is convicted, the *statement of the offence* required to be entered in the minutes of the clerk. (*R. S., part* 4, *title* 6, *art.* 1; 2 *R. S.,* 921, §§ 4, 6, 7, 8, 12.)

VI. The record, in the present case, does not show that the prisoner was present in court during the whole of the trial, nor at the rendition of the verdict. The following cases establish the position that such an omission is fatal. (*Dunn* v. *The Com.,* 6 *Barr's R.,* 389; *State* v. *Travers,* 1 *Overton R.,* 434; *People* v. *Perkins,* 1 *Wend. R.,* 91; *Rex* v. *Ladsingham, T. Raymond R.,* 193; *Holliday* v. *The People,* 4 *Gilmans R.,* 111; *Co. Litt.,* 227, *b.; Cole* v. *The State,* 5 *English R.,* 318.)

VII. The record shows, and also the affidavits, which make a part of it, that the jury were permitted to separate during the trial of the defendant, and suffered to mingle with their fellow citizens, and were not kept together in the care of sworn officers and bailiffs. Such a separation is fatal to a verdict, against the prisoner in a capital case. Such is the English law. (*Hays' Cr. Dig.,* 449; *King* v. *Stone,* 6 *Durn. & East.,* 53.)

VIII. The weight of judicial authority, in the other States of the Union, is in conformity with the English rule. (*Com.* v. *Caul,* 1 *Virg. Cas.,* 271; *Wiley* v. *State,* 1 *Swan,* 256; *Pfeifer*

v. *Com.,* 3 *Harris,* 468; *Wesley* v. *State,* 11 *Humph.,* 502; *McCann* v. *State,* 9 *Sme. & Mar.,* 465; *Com.* v. *Wormley,* 8 *Grattan,* 712; *State* v. *Prescott,* 7 *N. Hamp.,* 287; *Berry* v. *State,* 10 *Geo.,* 511, *Brayton,* 169; *McLean* v. *State,* 8 *Miss.,* 153; *Jones* v. *State,* 2 *Blackf.,* 475; *Cochran* v. *State,* 7 *Humph.,* 544; *Boles* v. *State,* 13 *Smead. & Marsh.,* 398; 5 *Geo.,* 85; *Com.* v. *Roley,* 2 *Pick.,* 496.)

IX. The law of New York, in respect to the separation of jurors, during the trial of a capital case, is similar to the English law; and, when it is permitted to take place, whether *with* or *without* the consent of the court, will vitiate the verdict. (*People* v. *McKay,* 18 *John.,* 212 : *Eastwood* v. *The People,* 3 *Park. Cr. R.,* 25.)

X. The record in the present case, shows that the trial of the prisoner continued three weeks, and that during all that long period of time the jury were not kept together, but permitted to mingle with the community. If the separation of one or two jurors, for a short time, from the rest of the panel, is in law sufficient ground to set aside a verdict in a capital case, how much is the necessity for doing so increased, where the whole of the jurors were suffered to disperse during the period of an exciting trial.

XI. In the case of the present defendant, it was *not* shown *affirmatively* on the part of the prosecution, and by *the clearest evidence, and beyond a reasonable doubt,* or by any evidence at all, that no injury to the prisoner occurred in consequence of the separation of the jury; but it was shown by affidavit, on the part of the prisoner, that the principal witness for the prosecution talked with two of the jurors on the subject of the trial, during the intervals of the adjournments of the court.

XII. It is not true, in point of fact, that the separation took place by the agreement of the defendant's counsel. They stated they had no objection to the jury separating. Still, the record alleges that it was with their *consent,* and that is the aspect in which it must be considered here. Our point, therefore, is that if the *separation* of the jury was with the consent of the prisoner, and with the approbation and approval of the court,

it cannot alter the law, and makes no difference in the consideration of the case.

XIII. There can be no doubt that the decision of a court sustaining a verdict in a capital case, where there has been a separation of the jury, can be reviewed upon a writ of error, and it may be presented in various forms. It can be, and has been inquired into by the Supreme Court, in this State, and a new trial ordered where it occurred.

In the case of *Com.* v. *Pfeifer* (3 *Harris*, 489), the fact of the separation of the jury appeared upon the *docket entries* in the case, and a transcript of the entries having gone up on the writ of error, the judgment was reversed and a new trial ordered.

In the case of *The People* v. *Douglass* (4 *Cow.*, 35), the defendant was convicted of murder in the Court of Oyer and Terminer. A motion was made below for a new trial, on the ground that two of the jurors separated from their fellows. The prisoner was remanded and sentence respited, and the case removed by a *certiorari* to the Supreme Court. Affidavits were read, and a new trial ordered.

In *Eastwood* v. *The People* (3 *Park. Crim. R.*, 25), *affidavits* were read at the general term of the Supreme Court, showing the jury had separated. The reason for a new trial had been assigned in the Court of Oyer and Terminer. The cause had been removed to the Supreme Court by writ of error.

In *Rex* v. *Woolf* (1 *Chitty's R.*, 401), the motion for a new trial was heard in the King's Bench, on affidavits made by prisoner's counsel, showing the separation of the jury.

In *McCann* v. *Mississippi* (9 *Sme. & Mar.*, 465), the prisoner's counsel moved for a new trial below, on affidavits showing the separation of the jury, and the affidavits went up with the record on a writ of error.

In *Com.* v. *Caul* (1 *Virginia Cases*, 271), affidavits were made and filed below, showing the separation of the jury, and they went up with the record on a writ of error.

XIV. The judge who tried the cause below erred in limiting the inquiry which the defence sought to make in reference

Stephens *v.* The People.

to the conduct of Sophia Bell towards the prisoner, to the period of the last illness of his wife. (*State* v. *Mix*, 15 *Mo.*, 153; *State* v. *Wolf*, *Ib.*, 169.)

XV. The judge erred in refusing to permit John Pullman, a witness for the defence, to testify on the subject of the *general conduct* of Sophia Bell towards the prisoner.

XVI. The court erred in overruling the offer made by the prisoner, to put in evidence the papers which were before the coroner's inquest, and which had been returned by the coroner, and were in court, containing, among other things, the testimony which Sophia and Fanny Bell had given to the coroner's jury, and which had been reduced to writing by his clerk, and signed by the witnesses. (*State* v. *Myers* 1 *Mills*, *N. C. R.*, 12; *People* v. *Hendrickson*, 1 *Park. Cr. R.*, 406; *Regina* v. *Taylor*, 34 *Eng. Com. L.*)

XVII. Mrs. Hannah, Isabella Bennett and Maria Hannah had sworn they kept provisions in the cellar of Clark's house, when they resided therein. The prosecution called Jane Harvey as a witness, and stated they proposed to show by her that no provisions were kept in the cellar of Mr. Clark's house, as stated by these witnesses. Exception was taken upon the ground that Mrs. Hannah, Isabella Bennett and Maria Hannah had been examined by the prosecution upon this point, the defence asking no questions whatever in relation to these matters; and that the matter being collateral, and the prosecution having made the witnesses their own upon these matters, they cannot seek to impeach them afterwards, on these points, by other witnesses.

XVIII. Michael Thornton, a witness for the prosecution in rebuttal, testified that he was clerk to the coroner when the inquest was held over the remains of Mrs. Stephens; he said he had written down the testimony of the witnesses, and had taken the evidence down correctly. He then stated, in reply to interrogatories from the District Attorney, portions of the evidence the Hannahs had given to the jury. He read from the papers which he held in his hands, adding, however, that he had no recollection of their statements whatever. The defendant ob-

jected to the witness being permitted to read from the paper when testifying, and contended that he must speak from a refreshed recollection, but the objection was overruled by the judge. In this the judge erred.

XIX. The court erred in receiving the evidence of John Bisco, when called in rebuttal by the People.

XX. The court erred in permitting the People to give in evidence and read to the jury the anonymous letter.

If there was error in the receipt of this letter in evidence, it was fatally disastrous to the case of the prisoner. Indeed, the learned judge made the question of authorship of this letter, and the motive which prompted it, the controlling or turning point of the case.

XXI. The court erred in refusing to issue an attachment upon the affidavit made in open court, and filed with the clerk, to bring into court Richard Stephens, a material witness for the defendant, duly subpenaed by him, and who had been present in court and examined in chief, but who was wanted as a witness in rebuttal, he having left the room before the trial was finished, after being expressly informed he must not leave the court.

XXII. The court erred in his charge to the jury.

*Nelson J. Waterbury* (District Attorney) and *Chauncey Shaffer,* for the People.

I. The writ of error, in criminal cases, brings up for review nothing but the record, and those proceedings which constitute a part of it. (2 *Saunders,* 100, *note* 1, 2 *Boc. Abr.,* 459 ; *Tidd's Pr.,* 1052–1094; *Kanouse* v. *Martin,* 3 *Sand. S. C. R.,* 593 ; *People* v. *Dalton,* 15 *Wend.,* 287 ; 17 *Wend.,* 467 ; 3 *R. S., 5th ed.,* 1034, § 22.)

The writ of *certiorari,* if allowed, must be allowed for the purpose, and no other, of bringing before this court some of those matters which are omitted in the record already before the court. (3 *Sandford,* 602 ; *Heart* v. *Suigat,* 21 *Wend.,* 40.)

Stephens *v.* The People.

II. In relation to the alleged separation of the jury (if that question should arise here), it is proper to bear in mind:

1st. That this question is not, and cannot be, legitimately, before this court. (*See Point I.*)

2d. It is not a matter of exception for review on a writ of error.

3d. No exception to their separation has been taken. *Exceptions* to the decisions of the court, made upon the trial, and embodied in a bill of exceptions, are the only matters that can be heard here. (2 *R. S.*, 736, § 21; 4 *Denio*, 9; 3 *Park. C. R.*, 27, *note a.*)

4. The separation of the jury, if illegal, can be taken advantage of only by motion in the Oyer and Terminer on the *irregularity*, and the decision of the Oyer and Terminer is not available on writ of error. (*See authorities last above cited.*)

III. If the court shall decide that this question is legitimately here, then we say, there was no error in the jury thus separating. Whatever may be the law in other States, the law was settled in this State, both before the Revised Statutes (*People* v. *Ransom*, 7 *Wend.*, 41; *People* v. *Douglass*, 4 *Cow.*, 26), and by the Revised Statutes (3 *R. S.*, 5*th ed.*, 1027, § 16), in these words:

"The proceedings prescribed by law in civil cases, in respect to impanneling of juries, *the keeping them together*, and the rendering their verdict, shall be had upon trials of indictments," &c. (*See also* 2 *Bennett and Heard*, 386.)

IV. In this case the separation of the jury was permitted upon the application of prisoner, and despite the objections of the District Attorney, and after the permission of the court was thus given, on the first day of the trial until the close thereof, no objection was taken by the prisoner or his counsel, to the jury's remaining separate, and therefore,

1. This case is not parallel with that of *Eastwood* v. *The People* (3 *Park. Cr. R.*, 25); for in the latter case six of the jurors without permission, after they had received the charge of the court, and had retired in charge of an officer to deliberate upon their verdict, separated themselves from their fellow jurors,

*viewed the premises where the homicide occurred, conversed with the neighbors and persons on the premises about the case,* called on their friends, and, after the lapse of an hour, returned and united in a verdict of *guilty.*

Of course a new trial was ordered, because of the *misconduct* of the jury.

V. The anonymous letter was properly received in evidence, notwithstanding it was written some months after the death of Mrs. Stephens.

1. It had been proved to be in the handwriting of Stephens.

2. Was also proved by the person to whom it was addressed to have been received, and to have been addressed by the prisoner.

3. It had been offered to the prisoner's counsel for cross-examination before it was read.

4. The prisoner's counsel did not anywhere object to the *competency of the letter as evidence,* but his objections were:

1. "The prisoner had a right of cross-examination of the witness upon the question of its reception by him (this cross-examination was again tendered by counsel for prosecution to the prisoner, and declined by him).

2. "That the prisoner could not be compelled to commence the cross-examination of the witnesses until the prosecution had finished their examination in chief."

5. The letter was admissible as admissions, or confessions of the prisoner, proving important facts in the case, to wit, *those very* identical motives which induced prisoner to murder his wife. (*People* v. *Hendrickson,* 1 *Park. Cr. R.,* &c.)

If that letter be true, the prisoner had sufficient motive for killing his wife; and if untrue, he cannot take advantage of his own libel.

6. Does that letter tend to show an "*alienation of affection on the part of prisoner in regard to his wife?*"

7. *But no exception* was taken to the reading of the letter in evidence.

VI. The testimony of Michael Thornton was properly received, for the purpose of impeaching the Hannahs; and of

the numerous objections of the prisoner's counsel, none are well taken; because:

1. The witness had a right to refresh his memory by reference to a deposition of the witness whom he was called to impeach, which he reduced to writing "most correctly," as the words fell from that witness' lips.

2. The witness did not and need not testify entirely from recollection. (*Russel* v. *Hudson R. R. R.*, 17 *N. Y. R.*, and *cases there cited.*)

The same authorities dispose of the objections taken to the testimony of Thomas Henry Jones, Jr.

VII. The questions propounded to Dr. Finnell and Dr. Clark were proper, and such questions have often been put and answered against objection. (*The People* v. *Hendrickson*, 1 *Park. Cr. R.*, 406; *affirmed by the Court of Appeals*, 2 *Kern.*, 358–363.)

They were the identical questions, in substance (though amplified), that had been put, over and over again, by the prisoner's counsel to these and other medical witnesses.

VIII. The question of the refusal of the court below to issue an attachment, does not properly belong here. It can only be taken advantage of (if erroneous) in the court below, on a motion for a new trial, on the ground of surprise.

But if the question is properly *here*, then, we say, the motion was properly denied; because:

1. There was no valid proof of the service of the subpœna—that is, the affidavit did not state when or where the subpœna was served. The affirmant merely stated his opinion of the law. The subpœna might have been served in New Jersey or Connecticut.

2. The affidavit does not show what kind of a subpœna had originally been served, nor that the witness *had disobeyed any writ of subpœna*. (2 *R. S.*, 540, § 34.)

3. The witness had attended and been examined and cross-examined, and discharged by the court for some days, and no subsequent subpœna had been served upon him, nor had notice to again appear been served upon the witness for a reasonable

time. (*Gra. Pr.*, 2d vol., 267; 1 *Str.*, 510; 1 *Marsh.* 410; 1 *Bing.*, 366; 2 *Str.*, 1054.)

4. The attachment was not applied for at the opening of the court, nor until about one-half hour after the evidence had been closed on both sides, and the respective counsel had arranged the order of their addresses to the jury. (*See Gra. Pr., above cited, and* 2 *Tidd,* 723.)

5. The circumstances of the case rendered the appearance of the application for the attachment *extremely suspicious.*

6. It did not appear that the witness was necessary or material, and the court should not grant the severe process of attachment against witnesses, unless this be shown. (2 *R. S.,* 540, § 34.)

7. It is discretionary with the court to grant an attachment or not. (3 *Wend.*, 376; 4 *Id.*, 229; 19 *Id.*, 569; 1 *Hill,* 300; 4 *Id.*, 119.)

IX. The exception taken by counsel for the prisoner, to the reference made by his honor to the anonymous letter, while charging the jury, appears to be simply an exception to a judge's referring to the evidence while charging a jury; especially so, when it is remembered that no objection was taken to the competency of the letter as evidence at the time when it was read in *evidence.*

X. The remaining exceptions in the case may be disposed of as follows, to wit:

1. To the question, "Do you know whether, during that one week, your aunt partook of any fluid or not," simply frivolous.

2. The inquiry as to the effects of the rice on the witness Fanny Bell, was properly allowed. It tended to show poison administered by the prisoner to his wife; it tended to prove the issue.

3. The conversation between the witness Fanny Bell, and Mrs. Stephens, just before she partook of the rice, was competent evidence to show her physical condition, and the progress of the poison.

4. The mass of papers taken before Police Justice Welsh and the coroner were not evidence for the prisoner; but yet, on prisoner's motion, were received. The evidence of Drs. Doremus and Wood and the Misses Bell before the coroner, was admitted as far as they had been examined in respect thereof.

5. The testimony of Mrs. Harvey, as to the provisions in the cellar, and to the condition of the cellar generally, was competent and properly admitted, as rebutting any supposition which might have been raised by the evidence of the Hannahs, that the arsenic alleged to have been purchased by the prisoner, was used by them to preserve their provisions in the cellar. The same applies to testimony of Mrs. Kirk.

6. Henry Maxwell's testimony related to conduct of Misses Bell, reflected on by defendant's witnesses, and covered same time embraced in their testimony.

7. John Biscoe's evidence was material, as impeaching the witnesses Hannahs, in regard to the alleged refusal of the coroner to allow them, at the inquest, to state certain facts known to them, tending to exculpate the prisoner.

*By the Court,* LOTT, J. The plaintiff in error was tried at a Court of Oyer and Terminer, held in and for the city and county of New York, on an indictment charging him with the murder of his wife.

His trial commenced on the 7th day of March, 1859, and was continued by adjournment from day to day until the twenty-sixth day of that month.

The jury found him guilty, and judgment has been rendered on their verdict.

That judgment, with a bill of exceptions, containing various exceptions taken to decisions of the court on the trial, was removed on a writ of error to this court for review, and subsequently, on an allegation that there was a diminution in the record, and the matters returned with said writ, a further return was made in obedience to a writ of *certiorari,* which was

allowed and issued for that purpose, without prejudice to any questions that might arise thereon.

By that return, it appears that the court, during the progress of the trial, usually adjourned between three and four o'clock in the afternoon of each day, till ten o'clock the next morning, except on Saturday, the 12th and 19th of March, when the adjournment was made till the Monday following, at ten o'clock A. M., and that the jurors during each adjournment, except that on the 25th day of March (when they retired to deliberate on their verdict, under the charge of four sworn officers), were permitted to separate.

It thereby further appears that motions for a new trial and in arrest of judgment were made before judgment was rendered, and that affidavits which are returned were read in support of and in opposition to such motions.

It is insisted by the counsel for the People that the matters brought up by the *certiorari* formed no part of the record, and cannot be considered by this court.

Without expressing any opinion on that point, we will, in view of the importance, particularly of one of the questions presented, here assume that these matters are properly brought up for review, and proceed to consider the case on that assumption.

The principal question to be examined is, whether the separation of the jury during the progress of the trial was illegal and vitiated the verdict.

That is a question of great practical importance, and its decision will affect not only the verdict and judgment in this case, but if the objection against the proceeding is valid, will, to a great extent, change the course of trial in all cases of felony. It is believed to be the general practice in trials of indictments for felonies of any grade, except that punishable by death, to permit a separation of the jury, and judges of extensive experience have extended that practice to capital cases. The question is presented as one of *power*, and will be considered in that aspect.

It is said by Lord Coke (*Co. Litt.*, 227, *b.*), that "a jury sworn and charged, in case of life and murder, cannot be discharged by the court or any other, but they ought to give a verdict." (*See also* 3 *Inst.*, 110.) The universality of that rule was questioned at an early day, and after a full deliberation in the case of the two *Kinlocks* (*Foster*, 22), it was held by nine out of ten judges, giving their opinions seriatim, not to be universally binding.

Sir M. Foster, in giving his opinion, states several exceptions to the rule, and showed that the only authority cited by Lord Coke in support of the position, did not in the least warrant it; and that the authority itself was subsequently overruled, and he comes to the conclusion that the power of the court in discharging juries is not capable of being determined by any general rule, but must be governed by the particular circumstances of the case presented.

That principle was afterwards recognized by Mr. Justice Blackstone in his Commentaries, who, in treating of trials in criminal cases, says that "when the evidence on both sides is closed, and, indeed, when any evidence has been given, the jury cannot be discharged (unless in cases of evident necessity), till they have given in their verdict." (4 *Com.*, 360.)

Exceptions are thus engrafted on the general rule as laid down by Lord Coke, and cases of necessity being admitted to form exceptions, it is necessarily left to the discretion of the court to judge of that necessity.

It appears from what is stated in *Rex* v. *Stone* (6 *Durn. & East.*, 527), tried at bar, that it was formerly deemed necessary, in order to carry out that rule, that a trial in a criminal case should be continued without interruption from its commencement to its close. In that case, the inconvenience, if not impossibility, of a strict adherence to that requirement became apparent. The prisoner was tried on an indictment for high treason, and it is stated in the report of the case that the court having sat, on the first day of the trial, from nine o'clock in the morning till ten o'clock at night, without any interruption or refreshment, the Attorney-General stating that his evidence

would occupy four hours more, and some of the jury being very much exhausted, and incapable, as they declared, of keeping up their attention much longer, the court adjourned till nine o'clock the next morning; Lord Kenyon observing that necessity justified what was compelled, and that though it was left to modern times to bring forward cases of such extraordinary length, yet no rule could compel the court to continue longer sitting than their material powers would enable them to do the business of it.

The jury retired to an adjoining tavern, where accommodations were prepared for them, and the bailiffs were sworn " well and truly to keep the jury, and neither to speak to them themselves, nor suffer any other person to speak to them touching any matter relative to the trial." It is stated in a note to that case, that at the Old Bailey, in the latter end of 1794, the trials of various persons for high treason lasted, Hardy's, nine days; Horne Tooke's, six days; and Thelwall's, four days. On the first of these trials, the adjournment was stated to be made by the consent of the prisoner, but on the second, the judges who sat, having in the meantime conferred with the rest of their brethren, said they were clearly of opinion it might and ought to be done *by the authority of the court*, without calling on the prisoner for any consent.

The rule was subsequently further relaxed in cases of misdemeanors, so far as to permit a separation of the jury without the custody of any officers during the progress of the trial, and the practice was sustained, after full consideration, in *Rex* v. *Woolf* and others, decided in 1819. (1 *Chitty R.*, 401; *also reported in* 2 *Barn. & Ald.*, 462.) The defendants in that case were tried on an indictment for a conspiracy, before Abbott, Ch. J., and found guilty. Their trial lasted two days. The court, at about eleven o'clock P. M. of the first day (the case being then unfinished), adjourned until the following morning, and the jury were permitted to separate and retire to their respective homes without the knowledge of the defendants or their attorneys, and on that ground an application was subsequently made to set aside the verdict.

The judges, Abbott, Ch. J., Bayley, Holroyd and Best, justices, delivered their opinions *seriatim* against the motion.

Chief Justice Abbott said his opinion was founded on the admitted fact that there were many instances of late years in which jurors in trials for misdemeanors had dispersed and gone to their abodes during the night for which the adjournment took place, and he considered every instance in which that had been done, to be proof that it may be lawfully done; and Justice Best, after referring to the cases cited in support of the motion, concludes that the only one which touched the question under consideration, was that of Lord *Delamere*, in the *4th State Trials*, 232, where, as he remarks, the judges appeared to have said that a jury once charged cannot be discharged.

In reference to which he says that such might have been the law at one time, but that the constant and uniform practice which had existed for a considerable length of time in discharging juries, would show that which was said in Lord Delamere's case was not to govern their decision.

The other cases were those where there had either been improper conduct on the part of the jurors after they were sent out to deliberate on their verdict, or where improper practices had been used by the parties to influence the decision of the jury in their favor. (See also 1 *Chitty's Cr. L.*, 628.)

It thus appears that in England the rule as laid down in Blackstone is so construed as to concede that the court have the power to permit a separation of the jury in cases of misdemeanor, and that its exercise is left entirely to the discretion of the court. It is true that no decisions have been produced establishing that authority there in capital cases, nor, on the other hand, have we been referred to any denying it. The important consequences dependent on the results of such trials, are calculated to secure and enforce all precautionary measures necessary to guard against improper influences, and may have restrained the judges from exercising the discretion vested in them.

The rule itself excepts no class of offences from its operation, but all are alike comprehended within its inhibitions.

When, therefore, it is established that the *power* to authorize a separation exists in one class of cases, it is difficult to see why it does not exist in all. The power itself may be general, while its exercise, in a sound discretion, may be limited.

In this country there has not been a uniformity of practice on the question under consideration. While it is conceded (I believe without exception) to be discretionary with the court, whether the jurors shall be kept together or be permitted to separate on trials of misdemeanor, that right, in cases of felony, is denied in some of the States, in others it is not only admitted and fully recognized, but the rules applicable to the exercise of that power in civil cases, are extended to criminal cases, so far even as to authorize a sealed verdict to be rendered. Thus it was held in a case in Missouri, decided in 1843, and in cases in Pennsylvania and Tennessee, decided in 1851 (all capital cases), that the separation of jurors by the permission of the court (and in the last two cases by the consent of the prisoner) was a ground for setting aside a verdict. (See *McLean* v. *State*, 8 *Miss.*, 153; *Pfeifer* v. *Com.*, 3 *Harris*, 468; *and Wesley* v. *State*, 11 *Humph.*, 502. )

It is stated in the case of *Berry* v. *State*, decided in Georgia in 1851 (10 *Geo.*, 511), in which the prisoner was convicted of larceny, after a separation of the jury by consent during the trial, that it was the duty of the court to keep the jury together in criminal cases, from the time the case is submitted to them until they are finally discharged from its consideration; but they nevertheless refused to grant a new trial. ·

In Ohio, the court, after full deliberation, have decided that it was not only competent to permit a separation of the jurors during the progress of the trial, but they have permitted them, on the submission of the case, to disperse after they had agreed, and return a sealed verdict. (*Sargent* v. *State*, 11 *Ohio*, 474; *State* v. *Engle*, 13 *Ib.*, 490; *Davis* v. *Same*, 15 *Ib.*, 72.)

The first of these cases was for passing counterfeit money; the second for manslaughter, and the last for arson.

Several cases were cited on the argument, the principal of which are referred to by Justice Selden in *Eastwood* v. *The People* (3 *Park. Cr. R.*, 25), showing the consequences of a separation of a jury after the case was finally submitted to them for deliberation and decision. Some of these assert the doctrine that the fact of separation alone vitiates the verdict, while in others it is held that abuse, or at least reasonable suspicion of abuse, to the injury of the prisoner, must be shown. The principal, and generally considered as the leading case in support of the first position, is that of *The Commonwealth* v. *McCaul* (1 *Virginia Cases*, 271).

In that case (which was one of felony for taking bank notes and coin from the State treasury), it appeared that the court, on the second, third and fourth days of the trial, made a temporary adjournment of a short duration, about two P. M., and that a general order was given by the court to the jury and the officers on the first evening of the trial, that the jury, on their being adjourned, should be kept together and not separated. Notwithstanding this direction, one of the jurors, against the remonstrance of the officer, went home for his dinner, and another, attended by an officer, visited his family, assigning the sickness of one of his children as his excuse. They remained from fifteen to twenty minutes. The first was asked by several persons whether the case of McCaul was determined. He said no, and no further conversation was had on the subject, and he excused his conduct on the ground of being unexpectedly sworn on the jury, leaving his business in such a state of derangement as to require his presence. The verdict was set aside, and Judge Nelson, in giving his decision, says: "The majority of the court were of opinion that proof of actual tampering or conversation on the subject with a juryman, was not necessary to set aside the verdict. The old rule was, that the jury was on no occasion to separate. I understand (though it was with difficulty the rule had at all been relaxed), that it relaxed only in cases of imperious or perhaps unavoidable necessity; such a proceeding would be productive of evils incalculable, and too great for the court by its de-

cisions to allow a door to be opened for them. Every danger, and particularly in such a case as this, should be watched and opposed in the beginning. The court will presume with fear and jealousy, and will not expose the trial by jury in criminal cases, to such risk of contamination as arises from the affidavits in this case. If the court had without necessity suffered a jury-man to go home without an officer (which it would never do), it would vitiate the verdict. There is as much danger in suffering a juryman to separate without the consent of the court, as if it had been done by such consent."

I have made these liberal extracts for the purpose of showing, first, on what slight facts and circumstances so strong an opinion was based, and next, that in view of the fact hereafter mentioned, the authority of the case (at least to the extent expressed in that opinion), is questionable. It was decided in 1812, and was reviewed in 1825, in a subsequent case in the same court (*Thomas* v. *Commonwealth*, 2 *Virginia Cases*, 479), which, so far as I have discovered, has been overlooked, or, at all events, does not appear to have been noticed in the subsequent consideration of the question.

That was a case of manslaughter. The prisoner was found guilty, and a motion was subsequently made to set the verdict aside, on the ground of misconduct in the jury while in charge of a deputy sheriff, which was denied. After judgment, an application for a writ of error was made and refused. It appeared on that application that the examination of the witnesses having been protracted to a late hour of the first day of the trial, and the attorney of the commonwealth being unable, from defect of sight, to proceed further, the jury were, with the consent of the prisoner, committed to two deputy sheriffs attending court, who were sworn to keep them together without separation, and without communication with any other person, or with the officers themselves, except on occasion of *indispensable necessity ;* and a charge to the like effect was given to the jury. The court then adjourned to the following day, and the jury were confined in the court house. Some time thereafter, one juror, attended by an officer, went to the stable ad-

joining the court house to have his horse fed. The next morning he did the same thing, then went to a store in the vicinity, and bought a small article. He also sent a message to his wife, explaining the cause of his detention. Two other jurors were permitted, at night, to go to the bar of the tavern in the neighborhood. One of them drank a glass of brandy and water, and the other a glass of wine. On the next morning the same jurors were again permitted to go to the tavern, and one of them, while there, drank a small glass of julep. Another juror was allowed to separate from the rest to take care of his own horse and that of a fellow juror, and was gone about ten minutes. These different transactions were done in the sight of and near the sheriff.

The case of McCaul above referred to, was relied on in support of the motion, and Dade, J., in delivering the opinion of the court on its denial, said: "The court could not consider that the rule established in that case, that a separation of the jury without imperious necessity will vitiate the verdict, is to be taken in a sense as exclusive as the words import, but should be understood in reference to the case in hand, according to a sound remark of Lord Ellenborough, in *Doe* v. *Guy* (3 *East's R.*, 21), "that general language used by the court in giving its opinions in any case, must always be understood with reference to the subject matter before them," and concludes with the following remark: "In McCaul's case there was the utmost facility of corrupting the jury, and in the latter (the case then under consideration), a bare possibility; and on account of a remote possibility, we do not feel ourselves justified to obstruct the justice of the country, where we cannot doubt that the prisoner has received no injury."

In this State, the general opinion, since the decisions in *The People* v. *Douglas* (4 *Cow.*, 26), and *The People* v. *Ransom* (7 *Wend.*, 417), until questioned by Justice Selden, in *Eastwood* v. *The People, supra*, has been, that the mere separation of a jury, although in a capital case, would not of itself be sufficient cause for setting aside the verdict.

After an expression of dissent by that eminent jurist (although not necessarily affecting the result in the case at bar), the question is considered of sufficient importance to justify a short review of the different cases, and, with an unfeigned respect for his opinion, it does not appear to me to be justified by the authority of the case relied on by him.

His conclusion is based on what is stated by him to be a direct decision of the Supreme Court, confirmed, as he claims, by a reference to it by Chief Justice Spencer, in his opinion in *The People* v. *McKay* (18 *Johns.*, 212), decided in 1820. The only evidence of such decision is contained in that opinion where, *arguendo*, the judge makes the following remarks: "A case analogous in principle occurred in Ontario county, in 1814. A woman of color was indicted and tried for murder, and found guilty. The jury had separated *after agreeing* on their verdict, and before they came into court, and on that ground a new trial was granted, and she was tried again."

There is nothing to show what causes led to the separation, or under what circumstances it took place. It may have been an act of great abuse, produced by improper means and with corrupt practice. It was certainly, from the naked facts stated, a gross violation of duty. The case had been submitted for their consideration, and the life of the prisoner was dependent on the result of their deliberation. According to the well established rules, they were to be kept together until they had agreed on and returned their verdict. Their separation after such directions, evinced a disregard of their obligation of duty, and was an act so unprecedented—as well to have justified a conclusion by the court, independent of any other circumstances —that their action was not only inconsistent with a proper administration of justice, and contrary to their duty to the court, but was of itself evidence of such improper conduct as at least to justify a reasonable suspicion of abuse. The question under consideration by the learned justice, when making the remark above quoted, was whether a new trial could be awarded for a capital felony, where the judgment had been arrested, and the case referred to was cited as an authority in support of that

position, and cannot with propriety be extended beyond the principle for which it was cited.

The cases of *The People* v. *Douglas* (4 *Cow.*, 26), *The People* v. *Ransom* (7 *Wend.*, 417), must therefore be considered as unaffected by the decision in *Eastwood* v. *The People.*

The effect of a separation of jurors, in a capital case, was one of the questions involved in *The People* v. *Douglas,* although it is true that the judges, in granting a new trial, placed their decision on the ground that they had been guilty of improper conduct in drinking ardent spirits.

An opinion deliberately expressed on the main question is not to be considered an *obiter dictum* merely, but is entitled to consideration as authority. So considered, the case of *The People* v. *Douglas* sustains the doctrine clearly and distinctly in the opinion delivered by Judge Woodworth, that a mere separation of a jury, without further abuse, although in a capital case, would not of itself be sufficient cause for setting aside a verdict, and is fully and expressly recognized as an authority for that position in *The People* v. *Ransom,* by Justice Sutherland, although it is suggested by Justice Selden, in his opinion above referred to, that he could only "be considered as having given a *quasi* assent" to it, while concurring in the result of the opinion expressed by Judge Woodworth.

It is also to be remarked, that in the great majority of cases (and indeed there are very few exceptions) where the question has been presented, the courts have placed their decisions in setting aside verdicts and granting new trials, on the ground of abuse, and not in the mere fact of separation, a circumstance of itself an authority against the sufficiency of the latter ground. If that was sufficient, it would have been unnecessary to have considered the question of abuse at all. The result therefore is, that the weight of authority is decidedly in favor of the power of the court to permit a separation in all felonies without any exceptions. If, however, there could have been doubt on the question, considered as one to be governed by the authority of judicial decisions, it appears to be entirely removed in this State by a positive statute, which declares that

" the proceedings prescribed by law in civil cases, in respect to the impanneling of jurors, *the keeping them together*, and the manner of rendering their verdict, shall be had upon the trial of indictments." (2 *R. S.*, 735, § 14.) The provision is general, and without any qualification or restriction whatever. That statute was passed several years after the case of *The People* v. *Douglas* was decided, and, it is to be assumed, with full knowledge of it, and the authorities cited in that case, including that of *The Commonwealth* v. *McCaul.*

The power of the court to permit a separation in civil cases, is undoubted, and it is constantly exercised, and had been long previous to the passage of that statute.

It is also conceded to be the rule, that the party who seeks to avoid a verdict in a civil case, on the ground that a jury have separated, whether such separation was with or without the authority of the court, must show, affirmatively, that the separation has, or may probably have had, some effect on the verdict (*Eastwood* v. *The People*, *supra*), and that the rule is the same in cases of misdemeanor, is abundantly settled in this country and in England. (*Ib.*)

As the same rule prescribed by law in civil cases, in respect to keeping jurors together, apply to the trials of indictments, and as the trial of indictments for all offences, without reference to their grade, is placed on the same footing and subject to the same regulations, there can be no foundation for the distinction sought to be made in capital cases, even if there were formerly a ground for such a distinction. Nor is there any reason in principle for it. The object of trials by a jury in all cases is the same. It is to ascertain the truth. That is always the same. " The principles of justice are immutable and eternal." If a fair and impartial verdict can be obtained in one case after the jurors have separated and gone to their homes, or mixed with their fellow citizens, what foundation is there for the assumption that it cannot be in another? and what reason can be assigned for sustaining a verdict in a case of a misdemeanor, when it could, upon the same state of facts, be set aside in a case of felony? The ground on which the dis-

Stephens *v.* The People.

tinction has been based is erroneous. It assumes that the tribunal, which is chosen to determine between the public and the citizen on questions affecting the life and liberty of the citizen, is corrupt, or, at all events, is in danger of being influenced by fraud and corrupt practices. Such a doctrine is repugnant to all ideas of a fair and just administration of the laws of the land, and strikes at the very existence of all our civil rights.

Sentiments were expressed in *Thomas* v. *The Commonwealth* (*supra*), in reference to officers having the custody of jurors, which may, with the same justice in the present day, without disrespect to such officers, be extended to jurors. He says; " Towards the officers of the law we are not warranted in extending a suspicion of corruption, for if we were to do so, he having many opportunities of corruption, there would be an end to all confidence in many of the most important proceedings in a court of justice;" and Justice Read, in *Davis* v. *The State*, in maintaining the right of the court in its exercise of a sound discretion to permit a jury to disperse during the progress of the trial, remarks, that " jurors are now considered as honest men, disposed to discharge the obligations of their oaths and justice, and it is not going very far to presume that they would resist all efforts to corrupt them, as much as a sworn constable."

The jurors, according to the usual practice in this State, are summoned several days previous to the time designated for holding the courts at which they are required to attend, from a select class of men, specially chosen by public officers designated for that purpose, and are required to be men of known competency, character and integrity, and possessed of property to a prescribed amount. This practice, while it is calculated on the one hand to secure the attendance of honest, fair and competent jurors, on the other hand affords the time and opportunity, both in civil and criminal cases, for tampering with them, and for corrupt appliances to a much greater extent, and with better prospects of success than during the short time usually allowed for obtaining refreshments, or during the ad-

journment from day to day. I may add that in a business community, the continuance of a jury together for the time the case in question occupied, would materially tend to a derangement of business and actual loss, and that a separation under such circumstances, as well as in counties where the means of accommodating jurors are limited, if attainable at at all, would be justified as a case of "evident necessity" fairly within the exceptions to the rule laid down by Blackstone. It might be urged, and in my opinion shown, that the danger growing out of the practice in keeping a jury together, with the inhibitions against talking on the subject of the trial only, while free conversation on other subjects, as well as a transmission of letters, and free access to the newspapers and various publications of the day are tolerated, is far greater than by allowing them to go at large during the adjournment, and attending to their business and domestic avocations; but I deem it unnecessary to discuss this branch of the case further, and conclude with the remark, in the language of the court in *State* v. *Engel* (*supra*), that in our day there is no necessity for adhering with tenacity to the doctrines of ancient times. Many of the notions in vogue centuries ago, have yielded to better reason, founded on more enlightened views and greater experience.

Having come to the conclusion that it was in the power of the court, on its own authority, to permit the jury to separate on the different adjournments during the progress of the trial, it is not material to express our opinion at length on the effect of the consent given by the prisoner to such separations. If it was ineffectual, it cannot vitiate or impair the order of the court authorizing it. I will merely say that I have not seen any reason to doubt the justice of the rule as laid down by Cowen, J., in the case of *The People* v. *Rathbun* (21 *Wend.*, 542, &c.), that a prisoner "may waive any matter of form or substance, excepting only what relates to the jurisdiction of the court," and that "any agreement deliberately made, any plain assent, express or implied, in respect to the orderly conduct of a suit, or even an agreement to admit a material fact,

upon the trial, cannot be revoked at the pleasure of the party," "that even in respect to a trial for felony, the principle is the same as that which binds in civil cases, and that a prisoner on trial in the Courts of Oyer and Terminer," "who defends by counsel and silently acquiesces in what they agree to, is bound the same as any other principal by the acts of his agent." The obligation of this rule was subsequently enforced in *Beebee* v. *The People* (5 *Hill*, 32), where the court refused to allow the withdrawal of a consent given with the approbation of the court, and remarked, that "in respect to the delay of the trial (caused by such consent), and the separation of the jury in the meantime, it is not for the prisoner to take advantage of the irregularity, if it be such, as the indulgence was granted on his application and for his benefit," although if improper conduct by any of the jurors had been shown, they would have felt it their duty to interfere and quash the proceedings.

Some other questions were raised, although not discussed at length on the argument, which I will proceed to consider. One was that two of the jurors had been guilty of misbehavior in holding a conversation with Dr. Doremus, a material witness, who had been examined on the part of the prosecution, in the court room, in relation to his testimony. This charge is founded on the affidavit of one witness only, and that under circumstances not entitling it to much credit. While he undertakes to state so much of the remarks of the Doctor as tend to show an impropriety of conduct on his part, he says that he did not hear the remainder of the conversation.

The remark stated to have been made by the juror was in relation to a fact which, I think, from the case, it is apparent, admitted of no difference of opinion, and therefore could not prejudice the prisoner. The charge is, however, fully denied by both of the jurors implicated, as well as by the Doctor. There was, therefore, no ground for setting aside the verdict on that account. The refusal of the court to issue an attachment against the witness Stephens, on the application of the prisoner's counsel, does not affect the verdict or judgment, and is not available as a ground of reversal here, for the following,

among other reasons: First, The testimony on both sides had been closed, and the court had so announced, and had directed the summing up to proceed. Second, Arrangements had been made by all parties for summing up, which was inconsistent with the introduction of additional testimony. Third, There is nothing in the affidavit, nor in the case, to show that the attachment was applied for with the object of having the witness examined, and no application was made for a delay or postponement of the trial till the return of the attachment. Fourth, If there had been, the examination of the witness at that stage of the case, rested in the discretion of the court.

It was also objected that the record does not show that the prisoner was present in court during the whole of the trial, nor at the rendition of the verdict. In reference to which, it is to be remarked that it is distinctly stated in the record itself that he was personally present on the impanneling of the jury, and when judgment was rendered; it is also shown by the return to the *certiorari*, that the jurors were polled on giving their verdict, and that the prisoner was present on every day of the trial previous to that time. There is, therefore, no valid ground for that objection.

Several exceptions to the rejection and admission of evidence were taken, which will now briefly be considered.

Assuming that those taken to the decisions made as to the exclusion of the papers before Justice Welsh, and as to the questions put to the witness, John Pullman, were well taken at the time they were taken, the objections were obviated by the subsequent introduction of those papers, and by the offer of the District Attorney, made while the witness Pullman was still in court, and before the defence closed their case, that every question that had been propounded by the defence to him, but which had been excluded by the court, might be put to the witness, and answered by him.

The testimony of Fanny Bell, in relation to the liquids taken by the deceased, and as to the effects of the rice on the witness, was pertinent to the main issue. The question as to the nature of the conversation between that witness and the deceased,

might have elicited an answer, which, in connection with other testimony, might have been pertinent when put; but if it were otherwise, the answer given to it was immaterial and harmless.

Doctor Finnell, a witness examined on the part of the defence, was asked whether certain symptoms, particularly specified, were symptoms of arsenical poisoning, and he was permitted to answer the question. This was admissible; he had previously given testimony in relation to the same subject matter, and the question put referred to symptoms of which evidence by other witnesses had been previously given, his opinion as a physician was therefore properly asked and admitted. (*See* 1 *Park. Cr. R.*, 495; 2 *Kern.*, 358, &c.)

The testimony of Jane Harvey was admissible to rebut that of Susan Hannah, Isabella Bennett and Maria Hannah, given on behalf of the prisoner, on their direct examination; and that of Michael Thornton and John Biscoe was also properly received for the same object.

The motion to strike out the testimony of Henry Maxwell and Charles Mulholland was properly overruled. The evidence related to the conduct of the witness Bell, which had been attacked by the defendant, and was therefore admissible; but conceding it to have been immaterial, as is claimed, the refusal to strike it out cannot avail the prisoner here. It had been taken without objection, and it was too late afterward to object to its effect.

The objection taken to the examination of William Knox, was not well founded. The avowed object of the prosecution in calling him, was to rebut the evidence introduced on the defence, which had then been closed. There can be no doubt as to the propriety of admitting him to be examined for that purpose; but if it were otherwise, it was discretionary in the court to permit the examination, and the exercise of that discretion is no valid ground of exception.

The admission of the anonymous letter is no ground of reversal; it was sufficiently proved to have come from the prisoner, and it tended to show a motive for the commission of the crime imputed to him; if, however, it were not strictly

admissible, no exception was taken to its introduction when produced; and if there had been, all objection to it was removed by the subsequent production of the papers used before Justice Welsh, including the letter in question, by the prisoner himself.

Exceptions taken to the charge, and refusals to charge on certain propositions submitted by the prisoner's counsel, remain to be noticed.

The general exception taken to the charge is clearly unavailable on well-settled rules, and the specific exceptions related to a reference by the judge to certain portions of the evidence, and his comments thereon. The remark, " What will a man give in exchange for his life?" was made a special ground of complaint on the argument; its truth was not denied, but the fact of its being entitled to credit as founded on " the highest authority," was questioned. That is of very little importance, as the truth of the remark itself is conceded. It is suggested, however, by the judge who made it, that it may be satisfactory, and perhaps useful to the counsel by whom the exception was taken, to refer to Matthew 16 : 26, in connection with the context in the further examination of the question by him. It is sufficient to say, in answer to all those exceptions, that the comments and remarks of the court on the testimony, are no ground for exceptions; moreover, the jury were expressly instructed that they were the judges of all questions of fact; that if the court had expressed any opinion upon the evidence, or upon any part of it, that they were still to determine for themselves what the evidence was, what weight was to be given to it, and what effect it should have in the case, giving the prisoner the benefit of every reasonable doubt.

The court was requested by the prisoner's counsel to charge on six distinct propositions, and he charged as requested on all except the second, which was slightly modified, and that was charged as modified. The original proposition went so far as to exclude the chemical analysis as evidence, if access to the body of Mrs. Stephens, after it was exhumed, could have been

had by other persons than those who made the *post-mortem* examination, especially if Robert Bell, one of the witnesses examined on the part of the prosecution, actually had access to and touched it merely, without any further agency or circumstances connected with such access, and that without qualification as to the time.

This is clearly too broad, and a modification of it by saying that if access could have been had by other persons under such circumstances that they could have applied arsenic, and that if Robert Bell actually had such access and tampered with the body then, that so much of the analysis as was made after the body was so exposed and tampered with, was not competent evidence, was unobjectionable.

The motions for a new trial and in arrest of judgment, were founded on matters which have already been considered, and need no further consideration. Our conclusion upon the whole case, after a full examination and deliberate consideration, is, that no ground for a new trial is shown. The judgment of the Oyer and Terminer must, therefore, be affirmed.

Judgment affirmed.